NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2468
    Facsimile: (213) 894-2927
    E-mail:    daniel.obrien@usdoj.gov
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney
JUDITH A. HEINZ (Cal. Bar No. 176264)
Assistant United States Attorney
Senior Trial Attorney, National Security Division
EVAN N. TURGEON (D.C. Bar No. 1010816)
Trial Attorney, National Security Division
United States Department of Justice
    950 Pennsylvania Avenue, N.W., Suite 7700
    Washington, D.C. 20530
    Telephone: (202) 353-0176
    E-mail:    evan.turgeon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>           v.<br><br>IMAAD SHAH ZUBERI.<br><br>        Defendant. | No. CR 19-642-VAP<br>No. CR 20-155-VAP<br><br>RESPONSE TO DEFENDANT'S INITIAL SENTENCING MEMORANDUM<br><br>Date:      November 30, 2020<br>Time:      10:00 a.m.<br>Location:  Courtroom 8A |

    Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

//

//

California, submits its Response to Defendant's Initial Sentencing Memorandum.

Dated: November 9, 2020                    Respectfully submitted,

                                           NICOLA T. HANNA
                                           United States Attorney

                                           BRANDON D. FOX
                                           Assistant United States Attorney
                                           Chief, Criminal Division


                                           _____/s/_____
                                           DANIEL J. O'BRIEN
                                           Assistant United States Attorney

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA

2

# TABLE OF CONTENTS

DESCRIPTION                                                          PAGE

**Contents**

TABLE OF AUTHORITIES..................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.     INTRODUCTION...................................................1

II.    THE COURT SHOULD REJECT DEFENDANT'S FACTUAL ASSERTIONS........1

       A.    FECA Violations.........................................2

             1.    Person AA........................................2

             2.    Person GG........................................3

             3.    Person P.........................................4

             4.    Person BB........................................4

             5.    Person I.........................................4

             6.    Person JJ........................................5

             7.    Defendant and Spouse.............................5

             8.    Foreign Donor Contributions Paid by Defendant....7

             9.    Defendant Knew the Foreign Donor Prohibitions....8

       B.    Tax Violations.........................................10

             1.    The Tax Loss is $7,299,556......................10

             2.    Income Was Fraudulently Derived.................11

             3.    The Tax Fraud Involved Sophisticated Means......13

       C.    FARA Violations........................................15

             1.    Bahrain National................................16

             2.    Turkey..........................................17

             3.    Libya...........................................17

             4.    Ukraine.........................................18

             5.    Qatar...........................................20

i

D.    Obstruction of Justice..................................20

E.    Acceptance of Responsibility............................22

III. CONCLUSION..................................................23

# **TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

Federal Cases

*United States v. Ghertler*, 605 F.3d 1256, 1267-68 (11th Cir. 2010). 14

*United States v. Augare*, 800 F.3d 1173, 1175 (9th Cir. 2015)....... 14

*United States v. Thorndike*, 563 Fed. Appx. 71, 74 (2d Cir. 2014)... 14

Statutes

18 U.S.C. § 3553................................................. 16

52 U.S.C. § 30101(8)(a) ........................................... 3

Rules

U.S.S.G. §1B1.3(a)(2)............................................ 14

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.   INTRODUCTION**

3       The Court has accepted several briefings on factual disputes in
4 this case over the course of an entire year.  Although the defense
5 has conceded some matters, several disputed issues of fact remain.
6 Defendant objects to guideline enhancements relating to the scope of
7 his Federal Election Campaign Act ("FECA") violations and whether he
8 violated the prohibition on contributions from foreign donors.  He
9 disputes the amount of tax loss and whether his tax fraud involved
10 sophisticated means.  He disputes the scope and nature of his
11 numerous Foreign Agent Registration Act ("FARA") violations.  He
12 claims that his obstruction of justice was limited to an isolated
13 incident with respect to one witness.  He claims to have accepted
14 responsibility for his offenses despite reneging on the obligations
15 set forth in his plea agreement and his attempts to deceive the
16 Court.  The government presents this Response to Defendant's Initial
17 Sentencing Memorandum and recommends that the Court reject
18 defendant's remaining factual defenses.

19 **II.   THE COURT SHOULD REJECT DEFENDANT'S FACTUAL ASSERTIONS**

20       The Court should resolve remaining factual disputes not only to
21 ensure that the guidelines are calculated correctly, but also so that
22 false entries in public records can be corrected and political
23 campaign committees can be directed to disgorge unlawful receipts.
24 At present, FARA and Federal Election Committee ("FEC") public
25 records are either rife with false entries or fail to report

26

27

28

1

information required by Congress.[1]  A ruling by the Court will allow the government to notify campaign committees of the need to disgorge unlawful contributions and file corrected public reports.

### A.    FECA Violations

Exhibit 1 is a spreadsheet[2] as stipulated to by the parties that highlights campaign contributions still under dispute.  Based upon the preponderance of the evidence standard, defendant's FECA violations total *at least* $774,158.[3]  (Response Brief, pp.  11-22)[4]

#### 1.    Person AA

Defendant seeks to validate contributions in the name of Person AA paid from joint accounts she shared with defendant.  The government has traced the ultimate source of these contributions to accounts exclusively controlled by defendant.  (Response Brief, pp. 11-14)  Defendant's argument that he may have loaned money, gifted money, or provided supplemental income to Person AA in order to "finance" some contributions (Dkt. 122, p. 4) lacks any evidentiary

---

[1] Some political campaigns and events received illegal contributions that placed, or place, them in an unfair advantageous position.  Others have been unfairly stigmatized in the press and social media as having been complicit in criminal activity.

[2] References in the simpler form of "Ex. [number]" are attached to the Declaration of Daniel J. O'Brien filed in support of this sentencing position.

[3] The spreadsheet identifies $954,558 in illegal contributions. To reduce the number of issues to be litigated, the government backed out $5,400 in contributions from Person AA to Campaign FF that could have been mathematically (but not logically) financed through Person AA's retirement income, and $175,000 in contributions from defendant to Campaign AA for which the government only has circumstantial evidence of reimbursement.

[4] Prior government filings are referenced as Obstruction Brief (Dkt. 42 filed on 12/16/19), FARA Brief (Dkt. 84 filed on 3/17/20), FECA Brief (Dkt. 87 filed on 3/18/20), Tax Brief (Dkt. 89 filed on 3/20/20), Response Brief (Dkt. 106 filed on 4/13/20), and Acceptance Brief (Dkt. 120 filed on 5/8/20).

support.  His claim that contributions might have been paid with rental income Person AA received overseas (*id.*) ignores the government's exhaustive tracing effort.[5]

      2.   Person GG

Defendant claims that he advanced money to campaigns and received reimbursement from Person GG later and that this only violated the text, but not the "spirit," of FECA.  (Dkt. 122, p. 5-7) Even if the Court were to accept this false assertion[6] as true, it does not present a legal defense, as defendant concedes.  (*Id.*, p. 6, fn. 5; 52 U.S.C. § 30101(8)(a) ("The term 'contribution'" includes— (i) any gift, subscription, *loan, advance*, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office").  When defendant issued and paid

---

[5] Some of these accounts were ultimately funded by overseas clients such as Sri Lanka and Person J.  The defense misunderstands the government's argument.  (Dkt. 122, p. 4-5)  The government does not claim these were foreign contributions; indeed, the parties have stipulated that said transfers were income to defendant.  The government's point is that Person AA's resources did not fund the contributions made in her name, as defendant claims.

[6] The Court should also reject defendant's version of the facts. Defendant argues that the summary of financial transactions set forth by the government (Response Brief, Ex. 26) corroborates Person GG's claim that he repaid defendant for his contributions by foregoing salary, about $6,000 to $6,500 per month, and handing defendant cash, about $4,000 per month.  (Ex. 2)  Exhibit 26 shows no such thing. Person GG first claimed that his salary from Zuberi was $2,500 per month over a two-year period running from 2014 through 2016.  Exhibit 26 confirms payments of $2,500 only for a four-month period, June through September 2014.  When confronted with the contributions, Person GG then claimed that his actual salary was $4,000 to $4,500 per month, but that the four $2,500 payments represent reductions in his salary to reimburse defendant for a portion of his contributions. Exhibit 26 shows that defendant never paid Person GG $4,000 to $4,500 per month.  For this and other reasons cited in the Response Brief, Person GG is not a credible witness.

the contribution, but stated that it was paid by someone else, he committed a crime.

### 3. Person P

Defendant similarly argues that contributions nominally made by Person P were advanced by himself and later reimbursed. (Dkt. 122, p. 7-8)  Again, even if the Court were to accept this false assertion[7] as true, it does not present a defense.

### 4. Person BB

The Court should reject defendant's incredible claim (Dkt. 122, fn. 6) that (a) a contribution in the name of "Gloria Wu" to Campaign A was a clerical error that should have reflected a valid contribution from his spouse, Willa W. Rao, and (b) a contribution to the same campaign in the name of "William W. Rao" does not involve his spouse.

### 5. Person I

Defendant claims there is no proof that defendant manufactured the name "Margaret" to make an illegal contribution. (Dkt. 122, p. 8-9)  Margaret doesn't exist (Response Brief, Ex. 30B); so, the

---

[7] Defendant's version of events is not true.  Contributions in the name of Person P were made in January and June of 2014.  Bank records and a Form 1099 filed with the IRS show that Person P received his entire salary of $60,000 for 2014.  (Response Brief, p. 17, Ex. 28)  Defense counsel has misread emails relating to a temporary interruption in payments to Person P.  First, the temporary interruption occurred the following year, 2015.  Second, the psychologist appointed by the court to address child custody issues did not claim the temporary interruption in transfers was based upon a misunderstanding; defendant did.  Defendant explained to the psychologist that the misunderstanding had been cleared up and continued to fund the investment.  (Response Brief, p. 17, Ex. 29)  Third, the "misunderstanding" was not connected to the reimbursement of contributions, but rather defendant's belief he wasn't receiving value for Person P's services or a return on his investment in the Cirqa business venture.  (Ex. 19A)  Payments resumed when Person P agreed not to talk to a reporter and not file WR Group tax returns. (Ex. 19)

obvious culprit is the person who paid for contribution.  Defendant made the payment with his credit card.  (Ex. 1)

### 6.   Person JJ

Person JJ denies having been solicited or reimbursed by defendant for campaign contributions.  Nevertheless, her close personal relationship with defendant, the $2,500 cash deposit into Person JJ's bank account the day prior to her $2,700 contribution, her statement that defendant often gave her cash for services rendered, her not reporting the $2,500 on her tax return as income, her lack of a prior history of contributing, her subsequent contributions of only minimal amounts, her limited financial means, and defendant's overarching pattern of reimbursing other contributions all provide sufficient evidence for the Court to make the factual finding requested by the government.  (Exs. 3A-C, 4, 5, 5A-B.)

### 7.   Defendant and Spouse

Defendant claims that wire transfers sent to him from a foreign corporation, Company B, explicitly for making contributions to Campaigns DD and D, cannot be linked to contributions made by defendant and his spouse to those same campaigns.[8]  (Dkt. 122, p. 9-10)  Defendant's objection ignores financial documentation filed by the government that traces the specific contributions in question to the foreign corporation as well as email discussions that link the source to the contributions.  (Response Brief, Exs. 41A through 43D)  The government expands upon that evidence here.

---

[8] Defendant did not report the money as income for services performed and provides no other explanation as to the purpose of the wire transfers.

5

The $25,000 contribution on May 22, 2012 to Campaign DD was paid with the $136,600 transfer on May 10, 2012 from the foreign corporation, Company B, into defendant's Dubai account.  Defendant promptly depleted nearly all funds in his Dubai account with a transfer into his USC Credit Union ("USCCU") account, leaving a balance of $1,330.  Over the next 20 days, defendant depleted nearly all of the funds in his USCCU account, leaving a balance of $53. During that 20-day period, the USC account issued payments to defendant's American Express ("Amex") 1003 account that funded the $25,000 contribution.  (Ex. 6)

The $10,000 contribution on May 24, 2012 to Campaign DD and the $5,000 contribution to Campaign A on May 29, 2012 were paid by the $71,600 transfer on June 12, 2012 from the foreign corporation, Company B, into defendant's Dubai account.  Within days, defendant depleted almost all of the funds in his Dubai account with a $72,000 transfer into his USCCU account, leaving a balance of $902. Defendant then used the funds to pay the remaining debts on his Amex 2010 account, which included the $10,000 and $5,000 contributions. (*Id.*)

Mathematically, the $2,500 contribution on September 27, 2012 to Campaign D could have been funded by one of two sources: the foreign corporation, Company B, that issued two wires of $90,000 and $180,000 for the explicit purpose of making campaign contributions, or a $45,000 transfer from Person J to pay a consulting invoice.   (Ex. 7) However, the timing of the transfers and email correspondence demonstrates the source to be Company B.  Defendant made the $2,500 contribution the day after he received the $90,000 wire transfer from

Company B; he paid off the credit card that incurred the campaign contribution debt two days after he received the $180,000 wire from Company B.  Moreover, defendant expressly linked the Company B money to the contribution, falsely stating that the contribution was made in the name of Person C, the principal of Company B.[9]

Defendant's claim that the $100,200 wire from Company B cannot be linked to defendant's $100,000 contribution to Campaign CC (Dkt. 122, p. 10)[10] ignores emails in which defendant sought reimbursement for three $33,400 contributions to Campaign CC.[11]  (Response Brief, Ex. 39)  Defendant's broader claim that wire transfers from Company B often constituted income for services rendered (Dkt. 122, pp. 13-14) is contradicted by Person C's testimony, as corroborated by contemporaneous emails (Response Brief, Ex. 40) that include an exchange where defendant complains that he has not received any compensation for services and Person C explains his refusal to pay consulting fees.  (Exs. 12, 12A)[12]

8.   <u>Foreign Donor Contributions Paid by Defendant</u>

Defendant's claim that contributions he made in the names of foreign clients were subsequently reimbursed and merely "facilitated" by him (Dkt. 122, p. 8) has no evidentiary support whatsoever.  He provides no explanation as to why many of these contributions do not bear the true foreign address of the "contributor" but rather

---

[9] Defendant fraudulently edited the acknowledgement letter from Campaign D to remove his spouse's name and insert the name of the foreign contributor.

[10] Defendant's claim that Person C lacks credibility is discussed below.

[11] $33,400 x 3 = $100,200.

[12] Most of the wire transfers constitute income to defendant not because he performed services, but because he converted the funds.

1   defendant's El Monte address.   He has submitted no transactions that

2   demonstrate any such reimbursements.   Even if these contributions

3   were reimbursed by the nominal contributors, the contributions were

4   illegal donations, just as in the cases of Persons GG and P.

5           9.   Defendant Knew the Foreign Donor Prohibitions

6           Defendant admits he was repeatedly advised of the prohibition on

7   foreign donors, that Persons C and E highlighted the prohibition for

8   him, that a campaign rejected a contribution defendant solicited from

9   Person A because Person A was a foreign donor, and that defendant

10  nevertheless continued to donate in the name of that same foreign

11  contributor to another campaign.   (Dkt. 122, pp. 10-15)   Defendant

12  claims that he was confused as to both prohibitions.   (*Id*.)[13]

13          Defendant bases his confusion argument upon an exhibit (Dkt.

14  122, Ex. 14) which relates to the *attendance* of a foreign national at

15  a campaign event and the security vetting process[14] and falsely cites

16  the exhibit for the proposition that foreign nationals "could

17  *contribute towards* and attend political events." (Dkt. 122, p. 11)

18  The exhibit does not say that.   FECA does not prohibit foreign

19  nationals from *attending* events; it prohibits them from monetarily

20  *contributing*.

21  _____

22          [13] As previously argued, defendant was well aware of the foreign
    donor prohibition from the inception of his scheme.   (FECA Brief, pp.
23  12-14; Response Brief, p. 18-22)   In the spring of 2012, when Person
    C voiced early concerns and tried to raise this issue with the
24  campaign, defendant interjected, "Just keep getting Americans and
    Green Card holders to keep contributing to Obama-Biden."   (FECA
25  Brief, Ex. 8, p. 54-63)

26          [14] Defendant was well aware that vetting was the issue under
    discussion.   (FECA Brief, Ex. 8, pp. 70-73, 85-87, & 100-108)   When
27  Persons C and E specifically raised the foreign donor issue,
    defendant deflected, "we are trying to manage people vetting process
    for this event." (*Id.*, p. 105)

28

Defendant falsely claims that Response Brief Exhibit 30G, donor forms filled out by Persons E and F, show that he communicated to the campaign that they were foreign nationals.[15]  But defendant never made these contributions on behalf of Persons E and F; instead, he kept the money for himself.  (Ex. 8)  The form prepared by Person D is far more instructive because defendant actually issued the contribution in her name.  Person D provided her foreign address on the donor form.  (Ex. 8A)  However, when defendant issued the contribution, he falsely changed Person D's address to his sister-in-law's business address in El Monte, California.  (Ex. 1)[16]

Defendant admits knowing that corporate contributions were prohibited but claims that the corporate transfers were merely a vehicle through which individuals sent their funds and that the contributions were made in the individual capacities of Persons A, B, C, and D.  (Dkt. 122, pp. 12-13)  Defendant submits no evidence showing that Company A and Company B were not the ultimate source of the funds.  His claim that the money constituted a deferred bonus or salary (*id.* at p. 13) to employees of Companies A and B similarly lacks support and is contradicted by evidence.[17]  Moreover, defendant's theory does not explain why Avenue Ventures modified invoices to Company B to disguise contribution reimbursements as

---

[15] Exhibit 30G only shows that Person E and F filled out the forms with their address in Saudi Arabia; they do not admit foreign citizenship.  Indeed, both forms falsely "certify that I am a U.S. citizen or lawfully admitted permanent resident of the U.S."

[16] Defendant also falsely characterized the invoice that generated the relevant international wire transfers as "consulting fees."  (Response Brief, p. 19-20)

[17] Person B was neither an employee of Company A nor Company B, but rather "not employed" and the spouse of Person A.  (Ex. 9)

consulting fees owed to defendant.  (FECA Brief, Ex. 8, pp. 13-18 & 32-41)

Defendant routinely violated campaign contribution laws and his violation of the foreign donor and corporate prohibitions should be assessed in that context.  The Court should find FECA violations of at least $774,158 as reflected in Exhibit 1.

**B.   Tax Violations**

1.   <u>The Tax Loss is $7,299,556</u>

The determination of tax loss does not affect the sentencing guideline calculation or restitution in this case.  Nevertheless, arguments raised by defendant impact issues concerning his capacity to pay agreed-upon restitution and acceptance of responsibility.

The defendant has abandoned his initial claim that the criminal tax loss computations failed to consider business expenses that total $2,647,070.  (Dkt. 90, p. 4)  The government refuted this argument in its Response Brief (p. 14) and defendant's most recent filing does not discuss the issue further.  Defendant nevertheless has failed to adjust his criminal tax computations.  (Dkt. 122, p. 18)

Defendant's claim that a portion of Person J's wire transfers included "clawbacks" for which he was compensated with an interest in defendant's U.S. properties, and hence did not represent income to defendant, is contradicted by the evidence.  Defendant's prior acknowledgement in his tax return that money from Person J constituted income in its entirety demonstrates that his "clawback" argument is a fabricated defense.[18]  Contracts, invoices, email

---

[18] Defendant says it is surprising the government would rely on defendant's admission in his 2015 tax return when it has accused

communications, and testimony demonstrate the purpose of Person J's international wire transfers.  The government filed with the Court examples of such evidence with respect to Person J's wire transfers in connection with services rendered by defendant in connection with the Al Areen scheme (Response Brief, Exs. 45, 46A, 46B, 46C, 47, & 48) as well as a spreadsheet (Tax Brief, Ex. 8) that summarized the purpose of nearly all of Person J's wire transfers.[19]

Defendant claims that the government has ignored evidence of "clawbacks" (Dkt. 122, p. 20) but the documentary record is devoid of any contemporaneous documents with respect to clawbacks or Person J having received interests in the U.S. properties.

2.   Income Was Fraudulently Derived

Defendant's assertion that U.S. Cares investor funds did not represent income is dependent upon his claim that the money was not fraudulently converted.  He passes off some of his lies as mere

---

defendant of lying.  It is commonplace to accept statements against interest as true no matter how much a defendant might have perverted the truth elsewhere.  *See* Fed. R. Evid. 801(d)(1), 804(b)(3).

[19] Out of roughly $8.5 million wired to defendant by Person J during the period 2012 through 2016, approximately $2 million was for consulting services for the Al Areen fraud against Congress, $3 million was for various consulting fees and the reimbursement of expenses incurred by defendant, $3 million represented the investment in US Cares, and $0.5 million was for charitable contributions and expenses defendant fraudulently claimed to have incurred.  (Tax Brief, Ex. 8)

Person J sent another wire transfer to Avenue Capital Group ("ACG") on June 29, 2017 for $1.274 million dollars.  This payment was beyond the scope of the 2012 through 2016 investigation and so the government is currently uncertain as to its purpose.  Defendant made two transfers back to Person J during this period: $396,596 from ACG to Person J on March 23, 2017 and $1 million from defendant to Person J on May 17, 2018 for the partial repayment of the US Cares investment.

puffery,[20] ignores other falsehoods cited in the government's Response Brief,[21] argues that he demonstrated good faith by expending funds on the project even though such expenditures represented less than three percent of investor funds,[22] and falsely asserts that he refunded all the money.  Defendant's actions should be viewed in their totality.[23] Defendant lied to his investors, converted the money, and failed to return that money when the viability of the project ended.  To this day, defendant has not returned $4 million in investor funds.  His claim that he repaid his investors is false; he returned to investors 50 cents on the dollar.  He did so only after they threatened legal action, after he became aware of the government's investigation, and while embarked on a scheme to silence witnesses.  (Obstruction Brief, p. 16-24)

Defendant's response to evidence establishing his conversion of funds intended for political contributions consists of an attack on

_____

[20] Defendant's evidence that Renee Wu/Jiyan Wu was a Chinese national who worked with him at Aegon back in 2006 (presumably in London) does not rebut the government's evidence that defendant and his spouse used the name as an alter ego.  (Dkt. 122, p. 19, fn. 16)  In fact, it shows the situation to be tantamount to identity theft. FBI database searches reveal that Renee Wu/Jiyan Wu has not entered the United States within the last ten years.  (Exs. 10A-B) Nevertheless, in 2014, defendant told Person P to pick up his check from Renee Wu in El Monte, California and he then instead retrieved it from defendant's spouse.  (Ex 11, 11A)  Defendant fabricated other meetings with Renee Wu in the United States.  (Tax Brief, Ex. 5, pp. 3-8).

[21] For example, defendant falsely told investors that he was transferring funds to a US Cares account in the United States that did not exist.  (Response Brief, Ex. 9, p. 6)

[22] The defendant acknowledges that only $180,000 out of $7 million invested, or 2.6 percent, was spent on the project.  (Dkt. 122, Ex. 11)

[23] Addressing defendant's analogy of a real estate agent, a person who buys a home based upon high-pressure tactics nevertheless has still purchased a home.  In contrast, the U.S. Cares investors received nothing in return for their investments.

12

1   the credibility of Person C (Dkt. 122, p. 14) but, as discussed

2   above, he ignores contemporaneous emails that demonstrate the

3   intended purpose of the wire transfers and bank records that show

4   defendant's conversion.  Defendant provides no explanation as to why

5   funds from Person C's company, specifically earmarked for political

6   contributions and inauguration events, were not expended for such

7   purposes but instead spent by defendant.

8        Defendant has not further responded to the government's other

9   fraud allegations that generated unreported income such as the fraud

10  against the Sri Lankan government, frauds against subcontractors

11  hired in connection with the Sri Lankan lobbying effort, or inflated

12  reimbursement requests submitted to Person J.

13               3.   The Tax Fraud Involved Sophisticated Means

14       Defendant's claim that his "tax crime was as simple as not

15  listing all of his income on the return" (Dkt. 122, p. 221) simply

16  ignores the most significant evidence.  As to the conversion of funds

17  intended as campaign contributions over the period April 25, 2012

18  through February 27, 2013, defendant instructed Person C to route all

19  of the wire transfers into defendant's foreign account.  (Response

20  Brief, Ex. 41A)  Defendant then transferred the funds from his Dubai

21  account to the United States in dozens of smaller transfers.

22  (Response Brief, Ex. 15)  Such inter-account transfers would make

23  these funds appear as though they were merely transfers of personal

24  wealth, not income.  Defendant also concealed his foreign accounts to

25  reduce the chance of IRS scrutiny.  He filed no FBARs[24] and, for every

26

27           [24] Defendant does not dispute his failure to file FBARs but
    claims he was unaware that he previously filed FBARs as an agent of

28

                                    13

tax return under examination, falsely answered "no" with respect to the ownership of foreign accounts on his Schedule Bs.  (Ex. 14)

Defendant asserts that not all aspects of his tax evasion were sophisticated, pointing out that the first two Sri Lanka payments were wired directly to defendant's U.S. account.  (Dkt. 122, p. 20) The mere fact that certain aspects of the scheme were not sophisticated does not preclude the enhancement.  *United States v. Augare*, 800 F.3d 1173, 1175 (9th Cir. 2015)(*citing United States v. Ghertler*, 605 F.3d 1256, 1267-68 (11th Cir. 2010) ("although some of the defendant's fraudulent activities were not sophisticated, the 'totality of the scheme' qualified for the 'sophisticated means' enhancement")).  Defendant limits his analysis to the international wire transfers and his proxy's transfer of those funds to defendant's corporate accounts.  (Dkt. 122, pp. 20-21)  He does not explain the dozens of confusing transactions that defendant subsequently made. For example, the government sees no discernable purpose for defendant to have Person P route funds WR received from Sri Lanka, to a real estate holding company, then to an Avenue Ventures company, and then to an escrow company for the purchase of real estate (Tax Brief, p. 6), other than to attempt to hide income.  Moreover, instructing the proxy to not file a tax return to prevent IRS scrutiny of in-and-out transfers demonstrates that this not a "run-of-the-mill" tax fraud. *See United States v. Thorndike*, 563 Fed. Appx. 71, 74 (2d Cir. 2014)(use of audit insurance in conjunction with the false returns,

Aegon.  (Dkt. 122, p. 21)  The signature "Zuberi" on the Aegon FBAR does not appear to be in defendant's handwriting.  However, the explanatory letter submitted with the 2008 FBAR indicates that defendant was aware of the filing, stating that he was "out of the country and could only send" an electronic signature prior to the filing deadline.  (Ex. 13)

1    which resulted in a coordinated response to the IRS and the

2    fabrication of documents, provided defendant with a sophisticated

3    means of concealing his own fraud).

4        **C.    FARA Violations**

5        The claim that defendant's assorted violations of FARA do not

6    constitute relevant conduct is wrong.   U.S.S.G. § 1B1.3(a)(2)

7    includes within the ambit of relevant conduct: "solely with respect

8    to offenses *of a character* for which § 3D1.2(d) would require

9    grouping of multiple counts, all acts and omissions described in

10   subdivisions (1)(A) and (1)(B) above that were part of the same

11   course of conduct or common scheme or plan as the offense of

12   conviction."   Section 3D1.2(d) describes the character such offenses

13   as follows:

> All counts involving substantially the same harm shall be
> grouped together into a single Group.  Counts involve
> substantially the same harm within the meaning of this rule
> . . . (b) [w]hen counts involve the same victim and two or
> more acts or transactions connected by a common criminal
> objective or constituting part of a common scheme or plan.

18       After enumerating various offenses that should or should not be

19   grouped, the guideline states, "[f]or multiple counts of offenses

20   that are not listed, grouping under this subsection may or may not be

21   appropriate; a case-by-case determination must be made based upon the

22   facts of the case. . ."   U.S.S.G. § 3D1.2.

23       Defendant's FARA violations involved the same harm, were

24   committed against the same victim, and were part of a common scheme

25   or plan.  Defendant's entire business was a common scheme to act as

26   unregistered agent for foreign clients and to lobby the United States

27   government for policy changes on their behalf.  These offenses were

28

1    all committed against the same victim -- the people of the United

2    States.   They involved the same harm -- secret and unchecked

3    influence on U.S. policy by foreign governments and individuals.

4         Because the Sentencing Commission did not issue an explicit

5    guideline with respect FARA violations, courts must apply the catch-

6    all provision of § 2X5.1, which states that "where there is not a

7    sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553

8    shall control, except that any guidelines and policy statement that

9    can be applied meanfully in the absence of a Chapter Two offense

10   guideline shall remain applicable."   The parties' stipulation that

11   there is no analogous guideline does not eliminate the character of

12   defendant's FARA crimes, and the guidelines for relevant conduct and

13   grouping therefore remain applicable defendant's FARA offenses.

14        1.   <u>Bahrain National</u>

15        The government has set forth testimony, emails, contracts,

16   invoices, and payments all reflecting that Person J, a Bahrain

17   national, hired defendant to trick the United States Congress and the

18   Government of Bahrain into believing that defendant was a U.S.

19   investor in the Al Areen Palace & Spa.   (FARA Brief, pp. 7-10)

20   Through this scheme, defendant sought to pressure the Bahrain

21   government into stopping its interference with Al Areen's

22   development.   Defendant lobbied approximately a dozen members of

23   Congress to this end, and secured letters from them that urged the

24   Bahrain government to acquiesce.   The evidence is overwhelming that

25   defendant acted as an agent of the Bahrain national while lobbying

26

27

28

Congress.[25]

Conversely, the defendant has submitted *nothing* to support his claim of investment in April 2013 -- no payment, no corporate ownership records, nor any other evidence.  The only "evidence" supplied by defendant is a backdated share purchase agreement to provide an unknown amount of money at some unknown date to acquire an interest in a company with some unknown relationship to Al Areen. (Response Brief, Ex. 50)

2.   Turkey

Defendant presents no defense to his failure to file a FARA registration statement with respect to Turkey.  His response to the allegations are *non sequitur*.  The government has not alleged that campaign contributions were bribes; it has not argued that lobbying activity cannot be compensated.  Defendant failed to register under FARA despite lobbying on behalf of the Turkish government.  His actions were not simply manifestations of his personal beliefs; he sought compensation for his efforts.

3.   Libya

Defendant likewise presents no defense to his failure to file a FARA registration statement with respect to Libya.  Whether others were architects or masterminds of the scheme[26] to procure the release of Libyan assets does not impact defendant's obligation to register.

---

[25] Defendant's claim that there is "no evidence Mr. Zuberi sought to influence U.S. policy" (Dkt. 122, p. 27-28) ignores the letters he solicited and obtained from Members of Congress.

[26] The government is unaware of any evidence that Person A or Person C lobbied members or Congress; rather, they retained defendant to do so.

4.   Ukraine

Defendant does make relevant arguments with respect to his failure to register under FARA with respect to his Ukraine principal, but they are insufficient to rebut the government's evidence. Defendant claims he received $1,000,000 for consulting about the production and distribution of fertilizer.  He questions why the invoice referenced by the government predates his lobbying activity. He correctly states that his lobbying activity with Members of Congress in Munich, Germany falls outside the statutory prohibitions. (Dkt. 122, pp. 29-30)  Nevertheless, defendant lobbied on behalf of a foreign client while in the United States.

Defendant issued the $1 million invoice on January 1, 2015, after he initiated attempts to further Firtash's political objectives.  Defendant initially solicited a subcontractor to "introduce the Group DF and its principals to the key players in the House, Senate and Administration" to further Firtash's "personal reputation management campaign" in August 2014.  (Ex. 15)[27]  In September 2014, he reviewed a proposal for the "elimination of sanctions against Russia," and "strengthening Russian-Ukrainian business enterprises" to assist an associate's attendance at a "Ukraine conference in Vienna." (Ex. 16, p. 1-5)  In December 2014, he attended a Ukraine dinner with the Vice-President of the United States. (Id., p. 6)

While most of defendant's lobbying activity may have occurred after he issued the January 1 invoice, it does not seem unusual that defendant would have requested payment having laid the groundwork for

---

[27] The government previously provided this evidence in the form of a summary spreadsheet.  (FARA Brief, Ex. 4)

18

the lobbying effort.  Moreover, the timing of his lobbying in the U.S.[28] may have occurred prior to the invoice because it generated results within days afterwards.  On January 9, 2015, defendant transmitted three letters of invitation from the House Foreign Affairs Committee to representatives of Group DF (prior to their official distribution) so that his foreign connections could make "an official trip" to discuss a "Ukraine rebuilding fund" and "Eastern European energy needs when you are in Washington." (*Id.*, p. 7-10)  On January 12, defendant promised, "We will call US Energy Department (cabinet administration) and members who deal with these issues in Senate and House to discuss this" and announced, "US rules and regulations are being changed to make this happen." (*Id.*, p. 7)

There are reasons to believe the services described in defendant's consulting contract falsely describe the services rendered in an effort to conceal unlawful lobbying.  First, the evidence establishes defendant's business model, talents, and expertise.  He used campaign contributions to forge relationships with U.S. officials, marketed those connections to foreign governments and nationals as a means to obtain access, and then lobbied on behalf of those foreign clients in exchange for money.  The government is unaware of any expertise defendant has with respect to the production and distribution of fertilizer.  Second, the juxtaposition of defendant's secret lobbying with registered lobbying conducted by Lanny Davis & Associates demonstrates that the non-registered campaign was designed to complement legitimate efforts.  Third, the March 23, 2015 contract presented by the defense does not

---

[28] While defendant conducted some of his lobbying activity overseas, he conducted such activity in the U.S. as well.

agree with the paid invoice.  The contract (Dkt. 122, Ex. 7) states that $1 million will be paid *after* the submission of an invoice that breaks down defendant's fee and expenses he incurred.  Incongruously, the paid invoice was issued on January 1, 2015,[29] three months *prior* to the contract's execution.

### 5. Qatar

Defendant lobbied the White House and Congress on behalf of the Qatar government to influence the United States' reaction to the Qatar Diplomatic Crisis in 2017.  The particulars of this matter are the subject of an ongoing investigation and are addressed in the government's under seal filing.

### D. Obstruction of Justice

Defendant does not dispute the two-level enhancement for obstruction, but rather the scope of his obstructive conduct.  Thus, the government provides only a brief response.

Defendant raises a fair point with respect to Person LL,[30] but his response does not successfully rebut the evidence.  The mere fact that Person LL initiated the request for refunds does not explain why defendant refused to mail him the checks but rather, on two occasions, insisted on a person-to-person meeting prior to any refund.  Person LL's cooperation with the Federal Bureau of Investigation ("FBI") shows only that he did not succumb to defendant's pressure, not that the refund was anything other than an incentive to keep him quiet.  The FBI 302 adequately conveys

---

[29] The March 27 wire transfer references "INVOICE GDFI-2015-01-01" referencing the same date as the January 1 invoice. (Response Brief, Ex. 15)

[30] Defendant provides a legitimate explanation as to his use of a different telephone number during the May 4 meeting.

defendant's effort to tamper with the witness on May 4, 2017, relating that:

> **ZUBERI would sometimes ask for [PERSON LL] to turn off his phone.  This happened two or three times.  These instances occurred after the inauguration. . . . [PERSON LL] advised that ZUBERI had expressed concerns about being followed by the FBI.**  ZUBERI was driving in a Jeep SUV while he and [PERSON LL] were in Los Angeles.  **ZUBERI did not want to discuss anything in the vehicle.**  ZUBERI explained to [PERSON LL] at some point he was having "tax issues." [PERSON LL] believed that ZUBERI was also having another issue.  **[PERSON LL] left his phone in the car when he and ZUBERI exited the car to speak.  ZUBERI had told [PERSON LL] not to speak with the FBI.  ZUBERI gave the impression that ZUBERI would pay for [PERSON LL's] attorney if necessary.**

(Obstruction Brief, Ex. 1)  Moreover, Person LL confirmed that he left his cellphone in the car because of defendant's request.  (Ex. 17)[31]

Defendant's attack on the credibility of Person C is based upon an exhibit showing that defendant stayed in a single room at a Marriott hotel on the night of May 27-28, 2018 (Dkt. 122, p. 45), not a one-bedroom hotel suite as recounted by Person C.  (Obstruction Brief, Ex. 6, p. 2-7)  The evidence does not support a meeting occurring on that date, but rather either May 11-12 or June 24.[32] Regardless, defendant offers no refutation of his attempts to

---

[31] The government requested this statement because defense declined to accept the government's evidentiary proffer that defendant told Person LL to leave his cellphone in the car prior to discussing the investigation.

[32] Person C testified the incident occurred somewhere between April and June of 2018.  (Obstruction Brief, Ex. 6)  Travel records produced by Person C reveal that he traveled in and out of Dubai on the following dates: April 4-5, April 15-16, May 11-12, June 18-19, and June 24, 2018.  (Ex. 18A)  Defendant's travel records indicate that he may have been in Dubai on May 11-12 and June 23-24.  (Ex. 18B)  The government has issued subpoenas to investigate the matter further.

interfere with respect to FBI's attempt to interview Person C in February 2019, which is corroborated by contemporaneous WhatsApp messages and synchronous efforts to tamper with Person LL. (Obstruction Brief, p. 11-15)

The defense mischaracterizes the government's argument with respect to defendant's tampering with U.S. Cares investors.  (Dkt. 122, p. 47-49)  The government does not contend that issuing refunds to defrauded U.S. Cares investors constitutes obstruction.  The evidence of obstruction consists of the refunds *and* subsequent statements by these investors that contradict their prior statements that defendant defrauded them.  The argument that the refunds came with strings attached is supported by defendant's efforts to obstruct with respect to Person LL and Person C, as well as his destruction of documents.

**E.   Acceptance of Responsibility**

The defense briefed the issue of acceptance of responsibility in a separate pleading and the government will similarly respond in a separate filing.  The government takes the position that defendant has failed to mitigate the harms he has caused as required by the plea agreement in that he has refused to pay restitution and failed to file FARA registration statements.  The defendant has also attempted to deceive the Court in connection with sentencing proceedings.  As things now stand, the defendant is not entitled to a reduction for acceptance of responsibility.

//

//

//

**III.  CONCLUSION**

The government respectfully recommends the Court make findings of fact as set forth in this memorandum, calculate defendant's sentencing guideline at level 32 with a resulting sentencing range of 121 to 151 months' imprisonment.