NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
DANIEL J. O'BRIEN (Cal. Bar No. 141720)
Assistant United States Attorney
Deputy Chief, Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2468
    Facsimile: (213) 894-2927
    E-mail:    daniel.obrien@usdoj.gov
ELISA FERNANDEZ (Cal. Bar No. 172004)
Assistant United States Attorney
JUDITH A. HEINZ (Cal. Bar No. 176264)
Assistant United States Attorney
Senior Trial Attorney, National Security Division
EVAN N. TURGEON (D.C. Bar No. 1010816)
Trial Attorney, National Security Division
United States Department of Justice
    950 Pennsylvania Avenue, N.W., Suite 7700
    Washington, D.C. 20530
    Telephone: (202) 353-0176
E-mail:    evan.turgeon@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>         v.<br><br>IMAAD SHAH ZUBERI,<br><br>      Defendant. | No. CR 19-642-VAP<br>No. CR 20-155-VAP<br><br>GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE TO GOVERNMENT'S POSITION RE ACCEPTANCE OF RESPONSIBILITY<br><br>Date:       November 30, 2020<br>Time:       10:00 a.m.<br>Location:  Courtroom 8A |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, submits its Reply to Defendant's Response to the Government's Position Re Acceptance of Responsibility.

Dated: November 9, 2020          Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
DANIEL J. O'BRIEN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES.............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   THE GOVERNMENT DID NOT "LAY A TRAP" FOR DEFENDANT.............1

III.  DEFENDANT'S LEGAL ARGUMENTS DO NOT SUPPORT A REDUCTION FOR
      ACCEPTANCE OF RESPONSIBILITY.................................3

      A.    Defendant is Not Being Punished For Presenting A
            Defense...............................................3

      B.    Defendant's FARA Violations Are Relevant to his
            Acceptance of Responsibility..........................3

      C.    Acceptance of Responsibility Requires a Factual
            Determination.........................................5

IV.   DEFENDANT'S FAILURE TO PAY RESTITUTION REFLECTS A FAILURE
      TO ACCEPT RESPONSIBILIY.....................................7

      A.    Defendant Refused to Pay Restitution Despite His
            Explicit Promise to Do So and His Ability to Pay......7

      B.    Defendant's Claim that He Could Not Pay His Taxes
            Unless Permitted to Travel Overseas is False..........9

            1.    Person J's Interest in the U.S. Properties is a
                  Fiction and Not Enforceable....................11

            2.    Potential Third Party Claims by U.S. Cares
                  Investors Do Not Permit Defendant to Abrogate His
                  Obligations Under the Plea Agreement...........12

            3.    Defendant's Obligation to Pay $16 million in
                  Restitution was Never "Contingent Upon his
                  Ability to Travel Overseas to Sell his Foreign
                  Assets"........................................14

      C.    Defendant Has Engaged in Tardy Efforts to Liquidate
            Real Estate in Response to the Government's Imposing
            "Nominee" or "Alter Ego" Liens.......................15

V.    DEFENDANT'S FAILURE TO FILE FARA REGISTRATION STATEMENTS
      AND FALSE REPRESENTATIONS TO THE COURT IN DEFENSE OF THIS
      FAILURE SHOWS THAT HE HAS NOT ACCEPTED RESPONSIBILITY........17

i

      A.    Bahrain...................................................17

      B.    Other FARA Violations....................................20

VI.  DEFENDANT HAD FRIVOLOUSLY CONTESTED FACTUAL ISSUES............22

VII.CONCLUSION..................................................23

# **TABLE OF AUTHORITIES**

DESCRIPTION                                                                   PAGE

Cases

United States v. Fellows,
    157 F.3d 1197 (9th Cir. 1998)....................................5

United States v. McKinney,
    15 F.3d 849 (9th Cir. 1994)......................................5

United States v. Villasenor-Cesar,
    114 F.3d 970 (9th Cir. 1997).....................................5

Statutes

22 U.S.C. § 618(e)...................................................6

Guidelines

U.S.S.G. § 3E1.1(a)..............................................2, 5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Whether defendant has accepted responsibility to merit a two-level reduction in his offense level is a factual determination the Court should make at sentencing.  At present, the defendant has failed to pay restitution and failed to make Foreign Agents Registration Act ("FARA") filings as required in his plea agreement. The defendant has also made false representations to the Court in his sentencing papers and has frivolously contested sentencing issues. The government files this Reply[1] to defendant's brief regarding acceptance of responsibility (Dkt. 136), primarily to correct its misrepresentations and to update the Court on events that have transpired over recent months.

## II.   THE GOVERNMENT DID NOT "LAY A TRAP" FOR DEFENDANT

The defense falsely asserts that the government tried to "lay a trap" for defendant in an attempt to deny him the sentencing guideline reduction for acceptance of responsibility.  Nothing could be further from the truth.  Prior to the execution of the plea agreement, the government warned defense counsel that false and frivolous assertions with respect to sentencing issues could impact whether defendant would receive an acceptance of responsibility

---

[1] Other government filings are referenced as Obstruction Brief (Dkt. 42 filed on 12/16/19), FARA Brief (Dkt. 84 filed on 3/17/20), FECA Brief (Dkt. 87 filed on 3/18/20), Tax Brief (Dkt. 89 filed on 3/20/20), Response Brief (Dkt. 106 filed on 4/13/20), Acceptance Brief (Dkt. 120 filed on 5/8/20), and Final Response Brief (filed concurrently with this document on 11/9/20).

The Defendant's Response filed on June 16, 2020 with respect to the acceptance of responsibility issue will be referenced by its docket number. (Dkt. 136)

1

recommendation.  As a result, the government did not offer the

boilerplate language with respect to acceptance of responsibility.

Instead, the plea agreement reads:

> Provided that defendant demonstrates an acceptance of responsibility for the charged offenses as defined in U.S.S.G. § 1BE1.1, *including as further explained in its application notes and in particular Note 1(A)*,[2] recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and, if necessary, move for an additional one-level reduction if available under that section.

(Dkt. 5, ¶5(c) (emphasis added))  Throughout the sentencing process,

the government continued to highlight the conditions defendant needed

to satisfy to receive a recommendation for acceptance of

responsibility.  The government provided defendant with advance

notice of its arguments and with detailed evidence prior to filing

its sentencing positions.  (O'Brien Declaration)  The government

repeatedly warned defense counsel that false representations to the

Court and reneging on promises in the plea agreement would put at

risk defendant's receipt of a government recommendation of an

acceptance of responsibility reduction.  (*Id.*)  The government

provided defendant with multiple opportunities to fulfill his

obligations set forth in the plea agreement, such as by extending

deadlines within which to pay taxes owed.  (*Id.*; Ex. 1A)  In its

---

[2] Application Note 1 lists eight factors relevant to the acceptance of responsibility determination: (A) truthfully admitting, not falsely denying, or frivolously contesting the offenses of conviction and relevant conduct; (B) voluntary withdrawal from criminal conduct; (C) voluntary payment of restitution; (D) voluntary surrender to authorities promptly after commission of the offense; (E) voluntary assistance to authorities in the recovery of the fruits of the offense; (F) voluntary resignation from the position held during the commission of the offense; (G) post-offense rehabilitative efforts; and (H) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

2

Acceptance Brief, the government did not reject the possibility that it would recommend acceptance of responsibility, offering the defendant yet another opportunity to satisfy his obligations. (Acceptance Brief, pp. 1, 4-5)

## III. DEFENDANT'S LEGAL ARGUMENTS DO NOT SUPPORT A REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY

### A.  Defendant Is Not Being Punished for Presenting a Defense

Defendant is correct that he has the right to litigate both issues of fact and the sentencing guideline enhancements at sentencing.  He should not be punished for doing so; the Constitution guarantees the right of an individual to defend himself or put the government to its burden of proof.  The parties specifically agreed to litigate sentencing issues.

Defendant is also correct that a court must balance factors that can militate in favor of acceptance of responsibility as well as factors to the contrary.  The government believes that both it and the Court should lean heavily in favor of recommending an acceptance reduction where a defendant agrees to plead guilty, particularly prior to indictment.  The government should create incentives for defendants to resolve their cases and avoid placing undue burdens upon the Court.  The government would not withhold this recommendation in a borderline case.

### B.  Defendant's FARA Violations Are Relevant to His Acceptance of Responsibility

Regardless of whether defendant's assorted FARA violations constitute relevant conduct,[3] defendant cannot seriously contend that his failure to comply with his FARA filing obligations and his false

---

[3] *See* Government's Response to Defendant's Initial Sentencing Brief filed on November 9, 2020, p. 14-16.

3

statements with respect to FARA offenses are not relevant to his acceptance of responsibility.  Defendant was required under the plea agreement to "satisfy any and all obligations under FARA prior to sentencing, including registering for any and all activity, past or present, that requires registration under FARA and amending any deficiencies in existing FARA filings."  (Dkt. 5, ¶ 4)  To this day, defendant's public FARA filings with respect to Sri Lanka falsely state that defendant made no political contributions during the relevant period prior to his filing a FARA short-form, despite the factual basis in his plea agreement stating that during that period, "defendant had made dozens of contributions of money from his own funds in connection with elections to political office or primary elections to select candidates for political office."  (Dkt. 5, Ex. B)  Thus, even with respect to the count of conviction, defendant has so far ignored his obligations under the plea agreement.  Even more troubling is the fact that the public remains unaware of the several other foreign governments and individuals for whom defendant worked and the political campaigns those foreign principals sought to influence, all because the defendant has refused to make the truthful disclosures he promised to make.

Application Note 1 explains why defendant's failure to file FARA registration statements and his false submissions to the Court on these matters constitute a failure to accept responsibility.  FARA is a continuing offense.  22 U.S.C. § 618(e).  Consequently, defendant has not engaged in a "voluntary withdrawal from criminal conduct" and his failure to undertake the curative measures required by the plea agreement demonstrates that he has not engaged in "post-offense

rehabilitative efforts."  Defendant's argument that he will wait for the Court to adjudicate these matters before he files (Dkt. 14-15), which is contrary to his express agreement that he will file FARA registration statements for any covered matters *prior* to sentencing, demonstrates why his "conduct in manifesting the acceptance of responsibility" has not been "timely."

**C.  Acceptance of Responsibility Requires a Factual Determination**

Whether defendant has "clearly demonstrate[d] acceptance of responsibility" is a factual determination.  U.S.S.G. § 3E1.1(a), *United States v. Villasenor-Cesar*, 114 F.3d 970, 973 (9th Cir. 1997). The Sentencing Guidelines, case law, and the plea agreement make clear that a defendant is not entitled to a reduction for acceptance of responsibility based solely on his plea of guilty.  U.S.S.G. § 3E1.1 Application Note 3 ("Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable . . . will constitute significant evidence of acceptance of responsibility . . . .  However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility.  A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right"); *United States v. McKinney*, 15 F.3d 849, 852 (9th Cir. 1994); *United States v. Fellows*, 157 F.3d 1197, 1202-03 (9th Cir. 1998)(district court did not commit clear error when it determined that defendant's statement of contrition after his plea of guilty was not sincere when

defendant continued to commit crimes after execution of search warrant); Plea Agreement ¶ 5(c).

This case is an exceptional one due to defendant's refusal to meet his obligations under the plea agreement, his attempts to deceive the Court, and his frivolous arguments without any evidentiary support. The major factors that dictate defendant's ineligibility for the reduction are the following:

1.   Despite the passage of an entire year, defendant has failed to pay his restitution obligations set forth in the plea agreement, despite his ability to pay. He has explicitly asked the Court to ratify his failure to do so. (Dkt 136, p. 16) As part of this effort to renege on his obligations, he has falsely claimed that his assets were encumbered by verbal promises to repay his victims, when, in fact, he negotiated agreements to pay them 50 cents on the dollar in 2017, and has made no efforts to make them whole over the past three years. (Obstruction Brief, p. 16-24) Defendant agreed to sell his U.S. properties to meet his tax obligations only after he learned that the Internal Revenue Service ("IRS") began filing nominee liens against all his real estate holding companies in July 2020. (Exs. 1B & 1D)

2.   Despite his statutory and contractual obligations to make required FARA filings, including FARA registration statements, defendant has failed to file a corrected FARA registration with respect to Sri Lanka or initial FARA registration statements with respect to Bahrain, Turkey, Libya, and the Ukraine. Defendant's failure to file with respect to Turkey and Libya are especially egregious because he has submitted no evidence (or even argument) to

justify his non-compliance with the statute.  (Final Response Brief, p. 17)

3.    In an effort to defend his acting as an agent for a Bahraini national, defendant lied to the Court about a fabricated investment in the Al Areen Palace & Spa.  He submitted *no* truthful evidence to support this claim.  Instead, he submitted a falsely notarized backdated document to support his claim that the April 2013 investment was genuine.  (Final Response Brief, pp. 16-17)

4.    Defendant falsely claimed to have acted selflessly to stop a war in the Middle East in 2017, when, in fact, defendant was actually acting as an undisclosed agent of the Government of Qatar in its lobbying efforts directed at both the Executive and Legislative Branches of the U.S. Government.  This conduct is especially significant to the assessment of defendant's acceptance of responsibility because it shows that defendant continued to covertly lobby on behalf of foreign governments even after he became aware of the government's investigation.

**IV.  DEFENDANT'S FAILURE TO PAY RESTITUTION REFLECTS A FAILURE TO ACCEPT RESPONSIBILIY**

**A.    Defendant Refused to Pay Restitution Despite His Explicit Promise to Do So and His Ability to Pay**

In his June 16, 2020 sentencing position concerning acceptance of responsibility, defendant expressly asked to be relieved of his obligation to pay taxes prior to sentencing, stating, "In any event, any shortfall from the entire contemplated payment should be excused."  (Dkt. 136, p. 16)  By doing so, the defendant seeks to have the Court place its imprimatur on a series of dishonest and manipulative efforts to avoid the consequences of his guilty plea.

In September and October 2019, defendant and his spouse executed closing agreements with the IRS in which they agreed to pay tax deficiencies, fraud penalties, and interest owed to the IRS totaling approximately $16 million.  (Tax Brief, Ex. 1)  On October 6, 2019, defendant executed the plea agreement in which he agreed to "[p]ay the tax deficiencies, fraud penalties imposed by the Internal Revenue Code, and statutory interest obligations as acknowledged in the Closing Agreements, prior to January 31, 2020."  (Dkt. 5, ¶ 3)

After his plea, defendant submitted a Personal Financial Statement to the U.S. Probation Office ("USPO") in which he claimed assets of $34,422,224 and liabilities of $2,052,140 for a total net worth of $32,370,084.  Those assets included $32,053,000 in real estate in Los Angeles County.  In addition, defendant informed the USPO that "he is the owner of five additional properties in Pakistan and is not aware of their values."  (Revised Presentence Investigation Report ("PSR"), ¶ 209)

Estimates of the value of domestic real estate owned by the defendant, his spouse, and their real estate holding companies, as well as dispositions of some asset sales, are summarized as follows:

| Property or LLC (Acquisition Date) | Ownership | Estimated Value | Sale Status |
|---|---|---|---|
| 600 W 9th St (September 2008) | Zuberi/spouse | $0.67 million | |
| Alice Street (April 2011) | Zuberi/spouse | $1.08 million | |
| 1124 W Huntington (November 2012) | Zuberi/spouse | $0.46 million | |
| Fountain 8, LLC (May 2014) | Zuberi/spouse | $1.75 million | Sold ($1.7m paid to IRS on 1/14) |
| Atlantic 17, LLC (May 2015) | Zuberi/spouse | $4.11 million | Sold ($3.6m paid to IRS on 6/4) |

| McCullough 18, LLC (September 2015) | Zuberi/spouse | $3.9 million | Sold ($4.1m, unknown amount pending to IRS) |
|---|---|---|---|
| Duarte 12, LLC (May 2015) | Zuberi/spouse | $4 million | |
| California 8, LLC (January 2018) | Avenue Property Holdings, LLC[4] | $4.25 million | |
| ISZ 9, LLC (April 2013) | Zuberi/spouse | $1.5 million | |
| Clary 6, LLC (June 2013) | Zuberi/spouse | $1.95 million | |
| Rosemead 32, LLC (August 2017) | Avenue Property Holdings, LLC | $9.12 million | |
| Total | | $32.79 million | |

(Ex. 2)

> **B.   Defendant's Claim that He Could Not Pay His Taxes Unless Permitted to Travel Overseas is False**

Defendant's claimed inability to pay his taxes is based upon three convoluted assertions: (1) that defendant's real estate is encumbered by an oral promise conveyed to Person J in which defendant pledged an unspecified interest of between 20 and 25 percent in unidentified U.S. properties to repay undocumented debts characterized as "convertible loans," "clawbacks," or "75% [of] funds held for investments" (Dkt. 122, pp. 19-20); (2) that defendant pledged a portion of his U.S. properties to repay Person J, Person M, and Person N for their US Cares investments (Dkt. 122, pp. 19 & 46-47); and (3) that defendant's ability to pay the $16 million was acknowledged by the government as "contingent upon his ability to travel overseas to sell his foreign assets." (Dkt. 136, p. 16)  Each of these points is unsupported by the evidence and has no legal relevance to defendant's restitution obligations.

---

[4] Avenue Property Holdings is owned by defendant and his spouse.

9

Generally, the claim that encumbrances or pledges upon the U.S. properties constitutes an inability to pay defendant's $16 million tax debt demonstrates defendant's lack of credibility.  First, defendant's claim is contradicted by his statements to the USPO in which he admitted he owned over $32 million in U.S. real estate and there were no encumbrances on the property.  The only substantial liability claimed by defendant was a $2 million "business loan" that cannot be legitimately interpreted as one of the aforementioned debts.  There is no reference to any encumbrances or pledges related to the U.S. properties in the defendant's financial statement.  (PSR ¶ 209)  Second, even if defendant paid all the amounts supposedly pledged to his victims, he would have ample real assets remaining with which to pay his taxes.  According to defendant, his "clawback" debt to Person J equals $4,273,654.  (Dkt. 90, Ex. 2)  Of approximately $7 million invested in US Cares, defendant repaid $3 million to the victims as part of his efforts to obstruct justice (Obstruction Brief, pp. 19-24), leaving a $4 million debt.  Even if one were to factor in these "debts," defendant would be left with over $24.7 million in domestic real estate assets,[5] well in excess of his $16 million tax obligation.

The Court should view defendant's claim that he orally agreed to grant interests in the U.S. properties as confirmation of defendant's failure to accept responsibility.  After learning of the government's investigation, defendant sought to obstruct it by paying off witnesses and victims in return for their silence and/or statements of exoneration.  (Obstruction Brief, pp. 3-24)  Defendant also

---

[5] $32,053,000 (assets) - $3,000,000 (debt) - $4,273,654 ("debt") = $24,779,346.

destroyed emails.  (Obstruction Brief, pp. 24-30)  Promises to repay
additional amounts during this time would have served the dual
obstructive purpose of witness tampering and making defendant
judgement-proof.  Defendant's attempt to parlay his obstruction into
an argument that the Court should condone his evasions under the plea
agreement is especially troublesome.  Rather than simply paying the
taxes he owed and promised to pay, defendant redoubled his efforts to
stymy the IRS's ability to collect.

>     1.  Person J's Interest in the U.S. Properties Is a
>     Fiction and Not Enforceable

As discussed in the Final Response Brief (pp. 10-11), the
documentary record is devoid of any contemporaneous documents or
discussions with respect to Person J having received interests in the
U.S. properties.  Instead, the evidence shows that payments from
Person J were payments for services rendered, investment funds that
defendant converted, and expense reimbursements.

Defendant claims that he engaged in discussions with Person J in
an effort to assign him interests in the U.S. properties *after*
learning of the government's investigation in February 2017.
(O'Brien Declaration)  Such claims are, to say the least, suspect.
These efforts appear calculated to make defendant judgement proof
without having to transfer actual interests in the properties to
Person J.  Defendant claims these "pledges" preclude him from meeting
his tax obligations, even though he has retained unfettered title to
the properties.  (Exs. 1A & 1B; O'Brien Declaration)

The "pledges" are legally unenforceable.  Defense counsel
claims that defendant's pledge was verbal and admits that no

agreement was reached as to the debt amount, vaguely asserting that Person J should have somewhere between a 20 – 25 percent interest in the U.S. properties.  Nor does defense counsel identify the specific encumbered properties.  (Ex. 1D; O'Brien Declaration)  Defendant's vague agreements are without legal effect and, at the very least, legally subordinate to defendant's prior statutory and contractual tax obligations.[6]

> 2.  Potential Third Party Claims by U.S. Cares Investors Do Not Permit Defendant to Abrogate His Obligations Under the Plea Agreement

Defendant's claim that he must keep his U.S. properties to repay defrauded U.S. Cares investors is even more disingenuous.  Defendant has never demonstrated an intention to refund the entirety of this money.  In connection with his attempts to obstruct justice, defendant paid off two of these investors with only 50 cents on the dollar and the third, Person J, received only one third of what was converted.  (Obstruction Brief, p. 16-24)  Defendant paid these partial amounts in 2017 and 2018.  (*Id.*)  Despite having reported adjusted gross income of over $9.9 million in 2017 (Ex. 3A) and over $5.7 million in 2018 (Ex. 3B), mostly from international wire transfers from Qatar,[7] defendant made no further repayments to his victims.  Indeed, in his April 28, 2017 settlement agreement with one

---

[6] Contrary to defendant's assertion, the government never "recognized from the outset of plea negotiations that Mr. Zuberi has pledged interests in his U.S. properties to various investors." There is no evidence that any such pledged interests exist.  Nor has the government ever recognized defendant's so-called "clawback" defense giving Person J a 20 – 25 percent interest in defendant's U.S. properties.  (O'Brien Declaration)

[7] The Qatar income will be discussed in the government's under seal filing, filed concurrently herewith.

of the U.S. Cares investors, the victim signed a release abandoning all future claims.  (Ex. 4)[8]

Defendant's legal and contractual debt under the plea agreement puts the federal government first in line to collect amounts owed. After the collection of the $16 million tax debt, defendant's assets would be reduced from approximately $32 million to $16 million, leaving ample funds for defendant to pay both fines imposed by the Court and his victims, if he sincerely wished to do so.

The government will not recommend any fine that compromises any actual victim's ability to recoup their losses.  Should defendant's victims bring civil actions after defendant's judgement at sentencing, there will be ample funds at defendant's disposal to pay subsequent civil judgements.  The government will do its best under

---

[8] The release stated that Company G "releases and discharges, US Cares, Mr. Zuberi, and AV from and against all causes of action, obligations, claims and demands whatsoever, in contract, law or otherwise which [Company G] ever had, now has or can ever have against US Cares, Mr. Zuberi and AV, upon or by reason of any matter, cause of thing relating to the Investment or the Investment Amount."

On June 30, 2020, defense counsel informed the government that notwithstanding the terms of the settlement agreement, defendant promised to pay the remaining amount of Company G's investment. Defense counsel provided the government with a July 7, 2017 email from defendant to Person M in which he states, "The 1st $500,000 wire was done and you received it in your personal account for [Company G].  The 2nd wire will be done this week. On the equity part, we should meet in Dubai to go over[.]"  (Ex. 4A)  Nothing in this email suggests a good faith intention to repay the entire amount owed. Indeed, the first $500,000 payment was due on April 29, 2017, upon execution of the agreement, but not paid until July 7, 2017.  The second payment was due May 14, 2017, but not fully paid until December 26, 2017.  (Ex. 4; Response Brief, Ex. 15)  In the three years since, defendant made no further payments nor any conveyance of property to Company G or Person M.  The email is consistent with defendant's pattern of fraud: lack of payment and lulling tactics coupled with unenforceable false promises.

1  the law to provide such litigants with evidence with which to pursue

2  their claims.[9]

3          3.  <u>Defendant's Obligation to Pay $16 million in</u>
           <u>Restitution Was Never "Contingent Upon his Ability to</u>
4          <u>Travel Overseas to Sell his Foreign Assets"</u>

5          The clear terms of the plea agreement refute defendant's

6  argument that the payment of taxes was contingent on his being able

7  to travel overseas and liquidate foreign assets.  There is no such

8  contingency in the plea agreement.  The provision permitting the

9  government to file quit claim deeds in the event defendant failed to

10  meet the January 31, 2020 deadline is not a liquidated damages

11  provision.  It provides that the quit claim deeds will be used to

12  satisfy the debt "*in partial* or complete satisfaction" of the debt

13  depending upon the amount realized.  (Dkt. 5, ¶ 3.b.i)  In no way

14  does the provision abrogate defendant's obligations as set forth in

15  both the closing agreement with the IRS and the plea agreement.  The

16  plea agreement also explicitly states that there are no side

17  agreements.  (Dkt. 5, ¶ 38)

18          The pretrial bond to which the parties agreed granted no right

19  for defendant to travel overseas.  It gave the government discretion

20  to permit such travel.  (Dkt. 73-1)  Prior to his plea of guilty, the

21  government agreed to permit defendant's travel overseas so he could

22  transfer $3 million of dollars from a Swiss bank account to the

23  United States to fund his bond.  The government then consented to

24  additional foreign travel near the end of 2019 based upon defendant's

25  claim that he wished to liquidate assets overseas.  The government

26

27          [9] Defendant has not pleaded guilty to defrauding clients or
     investors.  Therefore, restitution payable to them is not an option
28  under the charged statutes.

                                  14

never agreed to condition defendant's repayment of taxes upon such travel and defendant's assertion to the contrary is absurd.  Indeed, in response to various assertions by the defense that the defendant wished to travel overseas "so that he could pay his taxes," the government responded that it would not launder the proceeds of any overseas fraud committed by defendant nor aid him in engaging in additional tax fraud.  It informed defendant that if he used foreign funds to make tax payments it would require proof of legality. (O'Brien Declaration)

> **C.    Defendant Has Engaged in Tardy Efforts to Liquidate Real Estate in Response to the Government's Imposing "Nominee" or "Alter Ego" Liens**

When defendant failed to pay his tax obligations by the January 31, 2020 deadline, the government extended the deadline and urged the defendant to put up additional properties for sale.  (Ex. 1; O'Brien Declaration)  The government and defense counsel personally met on two occasions in February 2020 to discuss the payment of restitution. (Ex. 1; O'Brien Declaration)  On June 16, 2020, defendant filed his sentencing brief in which he set forth the position that he should be excused from paying restitution prior to sentencing.  (Dkt. 136, pp. 15-17)  On June 23, 2020, the parties engaged in a lengthy telephone call.  Defense counsel persisted in the position that defendant could not liquidate the real properties because defendant had pledged interests in those properties to his foreign clients and investors. The defense opined that investors would rely on these pledges to stymy IRS efforts to foreclose on the properties.  (O'Brien Declaration; Exs. 1A & 1C)

Defendant's intransigence changed in July 2020 after the IRS took the extraordinary step of filing liens, not only upon defendant and his spouse, but also upon all of defendant's real estate holding companies ("the LLC Properties"). (Ex. 1A)  These "nominee," "alter ego," or "special condition" liens would have prohibited attempts by defendant to convert any of the properties to his benefit until he met his tax obligations.  On July 8, the IRS informed defense counsel that the nominee liens had been approved by IRS counsel and that the filing process had begun.  Defense counsel then asked the IRS not to file the nominee liens so that the Duarte 12 and California 8 properties could be sold to pay defendant's tax obligations.  On July 22, IRS agreed to forbear from filing nominee liens on the Duarte 12 and California 8 properties. (Ex. 1A)  On August 20, defendant listed the Rosemead property for sale.  (Exs. 1A & 1D)  On September 19, defense counsel informed the government that *all* of the LLC Properties had been listed for sale.  (Ex. 1B & 1D)

Due to defendant's specious arguments that he could not liquidate real estate because of pledges made to his clients/investors/victims and his refusal to liquidate sufficient properties to satisfy his tax obligations over the course of an entire year, it is doubtful whether defendant will meet his tax obligations prior to sentencing.  First, it is unclear whether defendant will sell sufficient properties prior to sentencing. Defense counsel informed the government that the sale of the McCullough property for $4.1 million was scheduled to close on November 3,[10] but the proceeds will be insufficient to pay the total

---

[10] The government agreed to delay the filing of final sentencing briefs until after the November 3 closing date.  (Dkt. 199)

16

amount due.  Second, it is uncertain whether defendant can be trusted to route the proceeds of the sale to the government.  Defendant, through his counsel, has declined to include escrow instructions that would route the proceeds to the IRS or an attorney trust account. (Ex. 1A)  Moreover, for almost a year, defendant has steadfastly refused to honor the terms of the plea agreement and the latest turn of events may be merely an attempt to delay or dissuade the IRS from filing nominee liens.

Despite the passage of over a year since the execution of the plea agreement, defendant has failed to liquidate sufficient real property to meet his tax obligations.  Should defendant meet his tax obligations prior to sentencing, the issue for the Court will be whether defendant's turnabout reflects an acceptance of responsibility.  Defense counsel's statement that defendant undertook the sale of additional properties because "the government (the IRS primarily) is essentially forcing the client to list/sell without regard to those other claims through the threat of nominee tax liens against all property" (Ex. 1D) demonstrates an acceptance of the inevitable, not an acceptance of responsibility.

**V.   DEFENDANT'S FAILURE TO FILE FARA REGISTRATION STATEMENTS AND FALSE REPRESENTATIONS TO THE COURT IN DEFENSE OF THIS FAILURE SHOW THAT HE HAS NOT ACCEPTED RESPONSIBILITY**

**A.   Bahrain National**

Defendant is required to file FARA Registration Statements under both the law and the express terms of his plea agreement.  Defendant has failed to do and has not accepted responsibility for this relevant conduct.

Defendant was free to submit evidence and make arguments with respect to this issue.  He also had no obligation to respond to the government's claims; he could have remained silent and put the government to its burden of proof.  However, his affirmative false representations to the Court form another basis to deny him the guideline reduction of acceptance of responsibility.

For example, defendant claimed that the April 2013 signing ceremony was not staged.  (Dkt. 122, pp. 25-26)  He submitted to the Court a "Share Purchase Agreement" dated in April 2013, but which was actually signed and notarized a year and a half later.  (*Id.*, p. 27)  The document does not support defendant's claim that he made an investment of any amount in Al Areen.  The document sets forth no purchase price, no closing date, and no statement with respect to the ownership of Al Areen.  (Response Brief, Ex. 50)

Despite being confronted with evidence to the contrary, defendant persisted in the deception.  He claimed that the November 2014 notarization does not indicate that the April 30 date on the contract was backdated because "delay is often a practical necessity given that the parties must personally appear before the notary, oftentimes on different dates and diverse locations, as was done in this case."[11]  (Dkt. 136, pp. 9-10)  He stated that he never claimed

---

[11] The defense finds it puzzling that defendant would backdate a document prior to the government's criminal investigation.  The logical reason defendant backdated the document is the same reason he created a fake signing ceremony – to fraudulently convince the U.S. and Bahrain governments, and the public, that Al Areen had a U.S. investor.  Indeed, the actual signing and notarization occurred shortly after defendant issued another bogus Al Areen press release. (Ex. 7)

to have invested $700 million in the project[12] and that this figure was provided by an unknown source from a magazine article.  (*Id.*, fn. 6)  Both these claims are demonstrably false.

Contrary to defendant's claim that the parties signed the Share Purchase Agreement in April 2013, the parties signed the agreement in October 2014, just prior to the November 2014 notarization.  In a WhatsApp communication from defendant dated October 3, 2014, defendant stated, "Today, [Person J] finally signed the Al Areen contract.  After 1.5 year."  (Ex. 5)

Contrary to defendant's assertion that the amount of defendant's investment in Al Areen came from an unnamed source in a magazine article, the defendant was the source of this information.  In August 2015, defendant hired SKDKnickerbocker ("SKD"), a public relations firm, to rebut elements of the August 2015 Foreign Policy Magazine ("FPM") article that reported defendant's undisclosed work as an agent of the Sri Lankan government.[13]  (Ex. 6)  Email communications between employees of SKD, employees of FPM, and defendant show that defendant was the source:

> **Bill met with Mr. Zuberi for seven hours over the course of two days and went over everything that Mr. Zuberi could expect from this story.**  We did this with the intent of being fully transparent and fully accurate, and Bill repeatedly asked that the conversation be on the record or on background.  With [sic] that request was denied, Bill asked that it be recorded to ensure accuracy in the story and protect Mr. Zuberi as well as our journalistic interests.  Mr. Zuberi flatly refused.  Only then did we agree to talk to him off the record, and unrecorded, to ensure his side of the story was accurately told.  **Mr.**

---

[12] Interestingly, defendant has never told the court how much he purportedly invested.  Regardless, his bank records show no transfers of money to any entity associated with Al Areen.

[13] SKD also agreed to generate positive news stories for defendant that would bury the article's visibility in search engine inquiries.

**Zuberi is now saying the exact opposite of what he told Bill on several key points, which directly led to several of the sentences he is now disputing.**

(Ex. 6C)

Defendant disputed two aspects of the article with respect to the Al Areen investment.  First, SKD asked that the article clarify that the investment came from Avenue Ventures, not defendant individually.  FPM agreed that the article's language was imprecise and issued a clarification.  (Ex. 6C)  Second, SKD told FPM that the investment was $35 million, not $700 million, and asked defendant to provide documentation to support that claim.  (Exs. 6A, 6B, & 6C)  When defendant was unable to provide such documentation,[14] FPM stood by its story.  (Ex. 6C)

Defendant's series of fabrications have fallen down a rabbit hole that the Court need not follow.  Regardless of whether defendant claimed to have invested $35 million or $700 million in Al Areen, the reality is that he invested nothing.  The evidentiary record makes clear that he was paid by Person J, a foreign national, to lobby Congress on defendant's behalf.  Defendant's failure to register as required by the FARA statute and his obligations set forth in the plea agreement show that he has not accepted responsibility for his criminal conduct.

**B.   Other FARA Violations**

Defendant argues that he has not yet breached the agreement and that he will wait until the Court determines there were other FARA

---

[14] Defendant was dishonest not only with FPM, but also SKD.  He provided them with biographical statements that falsely reported he received an M.B.A. from Stanford University and had closed over $55 billion in transactions on behalf of Avenue Ventures. (Exs. 6D & 6E)

violations before he files registration statements.  (Dkt. 136, pp. 14-15)  This argument is without merit for three reasons.

First, the government never argued that defendant had already breached the plea agreement in this regard.  Rather, the government argued that the defendant "frivolously denied lobbying work on behalf of several foreign entities and individuals," that the government would not recommend acceptance of responsibility "at this time," and that "[a]bsent some extraordinary efforts by defendant to promptly rectify the situation, the government will maintain this position at time of sentencing."  (Acceptance Brief, pp. 1 & 5)[15]

Second, some of the FARA arguments raised by defendant are clearly specious.  He argues that his contributions in connection with lobbying on behalf of Turkey were not bribes (Dkt. 122, p. 28), but that fact is irrelevant to the registration requirement. Defendant argues that he was not the "architect" of the Libya scheme (Dkt. 122, p. 28-29), but that does not absolve him from a duty to register.[16]

Third, it would be physically impossible for defendant to register as required by the plea agreement "prior to sentencing" if he waits and hopes for the Court to render a favorable judgement on

_____

[15] Nor did the government argue that defendant's obstruction mandated that the Court deny him acceptance of responsibility.  The government stated that it "intended to recommend acceptance despite defendant's obstruction because defendant not only agreed to plead guilty but also promised to mitigate the harm he had caused." (Acceptance Brief, p. 1)  Defendant's subsequent actions prompted the government to question his acceptance of responsibility.  His prior obstruction is merely evidence the Court must consider as part of its analysis.

[16] Defendant appropriately raises a factual defense as to the Ukraine lobbying scheme.  Nevertheless, the evidence demonstrates that defendant lobbied the U.S. government on behalf of Dmitry Firtash.  (Final Response, pp. 17-20; FARA Brief, Ex. 4)

1  particular issues.  Defendant has a legal obligation under both the

2  FARA statute and the plea agreement to register.  He is in possession

3  of the facts and has access to the advice of counsel from which to

4  make his decision.

## VI.  DEFENDANT HAS FRIVOLOUSLY CONTESTED FACTUAL ISSUES

6       The plethora of briefing in this matter has been necessary

7  because defendant has frivolously contested issues of fact.  The

8  defense inaccurately characterizes some of these issues as legal

9  disputes.  For example, the argument that defendant disputed the tax

10 loss based upon a "legal claim" (Dkt. 136, pp. 10-11) is disingenuous

11 because it depends entirely upon the false factual assertion of a

12 "clawback" arrangement and a factual dispute as to whether he

13 defrauded U.S. Cares investors.  (Dkt. 122, pp. 46-47)

14      Most of defendant's FECA objections are based upon factual

15 disputes and many of them are frivolous or disingenuous.  Defendant

16 claims that Person P reimbursed contributions made with defendant's

17 credit card, using defendant's business address, a year later, by

18 withholding salary payments.  This claim is false.  Defendant

19 withheld the payments because he disputed the quality of Person P's

20 work.  He resumed the payments when he needed Person P's assistance

21 to fight public allegations that he violated FARA and to conceal his

22 tax fraud.  (Final Response Brief, pp. 16-17)  Defendant continues to

23 claim that contributions might have been funded from legitimate

24 sources despite the government's exhaustive financial tracing of

25 those contributions.  (Final Response Brief, pp. 2-3 & 5-8)  He

26 claims that he forgot he was the sole signatory to a USC Credit Union

27 account.  (Dkt. 136, pp. 11-12).

28

The myriad of disputes in this case are the result of defendant's intransigence, repeated lies, and attempts to deceive the Court.  The government's substantial efforts to resolve disputes have been stymied by defendant's dishonesty.  The circumstances that prohibit a three-point sentencing guideline reduction for acceptance of responsibility have been entirely within defendant's control.  The resulting guideline range is one of his own making.

**VII. CONCLUSION**

The Court should make a final determination with respect to defendant's acceptance of responsibility at the sentencing hearing. The government respectfully recommends the Court deny the reduction for acceptance of responsibility and calculate defendant's sentencing guideline at level 32 with a resulting sentencing range of 121 to 151 months' imprisonment.