1        **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3      **HONORABLE VIRGINIA A. PHILLIPS, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**        )
                                         )
6          **PLAINTIFF,**               )       **CASE NO.**
                                         )
7          **vs.**                      )       **CR 19-00642-VAP**
                                         )       **CR 20-00155-VAP**
8   **IMAAD SHAH ZUBERI,**              )
                                         )       **PAGES 1 TO 67**
9          **DEFENDANT.**               )
    _____    )

10

11

12

13            **REPORTER'S PARTIAL TRANSCRIPT OF**
                        **SENTENCING**
14          **THURSDAY, FEBRUARY 18, 2021**
                       **10:00 A.M.**
15            **LOS ANGELES, CALIFORNIA**

16

17

18

19

20

21

22
         _____
23

         **MIRANDA ALGORRI, CSR 12743, RPR, CRR**
24          FEDERAL OFFICIAL COURT REPORTER
            350 WEST 1ST STREET, SUITE 4455
25          LOS ANGELES, CALIFORNIA 90012
                MIRANDAALGORRI@GMAIL.COM

1                    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         NICOLA T. HANNA
          UNITED STATES ATTORNEY
5         BY:  DANIEL J. O'BRIEN
          BY:  ELISA FERNANDEZ
6         BY:  JUDITH A. HEINZ
          Assistant United States Attorneys
7         United States Courthouse
          312 North Spring Street
8         Los Angeles, California 90012

9
     **FOR THE DEFENDANT:**
10
          BROWN GEORGE ROSS, LLP
11        BY:  THOMAS P. O'BRIEN
          BY:  IVY A. WANG
12        BY:  NATHAN F. BROWN
          BY:  MATTHEW O. KUSSMAN
13        801 South Figueroa Street
          Suite 2000
14        Los Angeles, California 90017

15        KUTAK ROCK
          BY:  DAVID A. WARRINGTON
16        1625 Eye Street NW
          Suite 800
17        Washington, DC 20006-4061

18        HOCHMAN SALKIN TOSCHER PEREZ, P.C.
          BY:  EVAN J. DAVIS
19        9150 Wilshire Boulevard
          Suite 300
20        Beverly Hills, California 90012

21

22

23

24

25

 1              **LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 18, 2021**

 2                              **10:00 A.M.**

 3                                 **---**

 4              THE CLERK:  This is item Nos. 1 and 2, case

 5   Nos. LACR 19-642 and LACR 20-155, United States of America

 6   versus Imaad Zuberi.

 7              Counsel, please state your appearances.

 8              MR. DANIEL O'BRIEN:  Good morning, Your Honor.

 9              Daniel O'Brien, Elisa Fernandez, and Judith Heinz

10   appearing on behalf of the United States.

11              THE COURT:  Thank you.  Good morning.

12              MR. TOM O'BRIEN:  Good morning, Your Honor.

13              Tom O'Brien along with my client Imaad Zuberi who

14   is present before the Court out on bond.  Along with us is

15   Ivy Wang and Matt Kussman, Nate Brown, David Warrington,

16   Evan Davis.

17              THE COURT:  Thank you.  Good morning.

18              This matter is on the Court's calendar for

19   sentencing.  Are both sides ready to proceed?

20              MR. DANIEL O'BRIEN:  Yes, Your Honor.

21              MR. TOM O'BRIEN:  Yes, Your Honor.

22              THE COURT:  All right.  The way that we will

23   proceed this morning would be the same as I conduct every

24   sentencing with the following exception, and that is I'm going

25   to go through in some detail my -- the guideline calculations

1    and my intended sentence.

2              But before I get to the 3553 factors, if either

3    side wishes to discuss any of the matters that were filed under

4    seal not on the public docket, then we will clear the courtroom

5    with only counsel who have the necessary clearance, and I will

6    hear that matter in a sealed hearing.  And then we will go back

7    into session to go through the rest of the argument regarding

8    the 3553(a) factors.

9              Is either side wishing to have such a sealed

10   portion of argument?

11             MR. TOM O'BRIEN:  On behalf of my client, we are,

12   Your Honor.

13             THE COURT:  But you will not be arguing that

14   part.

15             MR. TOM O'BRIEN:  That is correct.

16             THE COURT:  All right.

17             MR. DANIEL O'BRIEN:  Your Honor, I will add that

18   there is a specific exhibit that the defense filed that remains

19   under seal that the Government would want to discuss.

20             THE COURT:  All right.  We will do that at a

21   later point.

22             All right.  The presentence report was disclosed

23   on January 24th, 2020, and the addendum and the revised report

24   was filed on July 10th.

25             Mr. O'Brien, would you and your client stand at

```
 1    the lectern?

 2                    MR. TOM O'BRIEN:  Yes.  Of course.

 3                    THE COURT:  Have you reviewed those with your

 4    client?

 5                    MR. TOM O'BRIEN:  I have.

 6                    THE COURT:  And, Mr. Zuberi, have you seen the

 7    probation officer's report?

 8                    THE DEFENDANT:  Yes, Your Honor.

 9                    THE COURT:  Have you reviewed them?

10                    THE DEFENDANT:  Yes.

11                    THE COURT:  Have you discussed them with your

12    lawyer?

13                    THE DEFENDANT:  Yes.

14                    THE COURT:  Thank you.  All right.  Actually, as

15    to -- my statement on the intended rulings is pretty lengthy,

16    so if you want to be seated, you may.

17                    MR. TOM O'BRIEN:  Thank you, Your Honor.

18                    THE COURT:  Has the Government complied with the

19    requirements of the Crime Victims' Rights Act?

20                    MR. DANIEL O'BRIEN:  Yes, Your Honor.

21                    THE COURT:  Are there any victims present that

22    wish to address the Court today?

23                    MR. DANIEL O'BRIEN:  No, Your Honor.

24                    THE COURT:  Thank you.  All right.

25                    In addition to the presentence reports, I have
```

1    reviewed everything that both sides have filed, and I'm going

2    to list the main points just to make sure that you haven't

3    filed anything that I haven't reviewed although I'm very

4    confident that I have reviewed everything.

5              So the Government filed its -- in December of

6    2019, the Government filed its position regarding obstruction

7    of justice.  On March 17th, 2020, the Government filed its

8    sentencing brief regarding the FARA violations; on March 18th

9    of 2020 filed its position regarding the Federal Election

10   Campaign Act violations and on March 20th filed its position

11   regarding the tax violations; on April 13th filed its response

12   to the defendant's objections to the presentence report; on

13   May 18th, 2020, filed its position regarding acceptance of

14   responsibility; November 9th, 2020, its response to the

15   defendant's sentencing memorandum and its reply in response to

16   the defendant's response regarding acceptance of

17   responsibility; then November 9th the Government's final

18   sentencing position.

19             On March 23rd of last year, the defense filed its

20   objections to the presentence report; on May 18th the

21   defendant's initial sentencing memorandum; on June 16th the

22   defendant's response to the Government's position regarding

23   acceptance of responsibility; on July 24th the defendant's

24   position regarding the presentence report.  That would be the

25   amended presentence report.

1          Does either side have any objections to the

2    presence report other than what you have set forth in your

3    papers?

4          MR. DANIEL O'BRIEN:  No, Your Honor.

5          MR. TOM O'BRIEN:  No, Your Honor.

6          THE COURT:  All right.  I am going to go through

7    the objections.  As to some of them, I am going to expand on my

8    rulings when I go through the 3553(a) factors.

9          The Government initially objected to -- well,

10   they initially persisted in their objection to the presence

11   report of the probation officer's characterization of the FARA

12   violations.  I would sustain that objection.  They objected

13   with respect to the probation office's view that the FARA

14   violations were not part of relevant conduct, and I would

15   sustain that objection.  Relevant conduct includes offenses

16   that were part of the same course of conduct or common scheme

17   or plan as the offense of conviction.

18          So although probation correctly noted that there

19   is no grouping under 3D1.2(d) of the FARA count, because there

20   is no guideline section -- no analogous guideline section,

21   whether the Court considers it in terms of the guideline

22   calculation or really in connection with 3553(a) factors,

23   particularly the first factor, the nature and circumstances of

24   the offense, I agree with the Government that that conduct was

25   part of a common scheme or plan or same course of conduct.

1          The presentence -- initially the Government

2    objected to the presentence report determination as to the

3    amount of the federal tax loss, but that is now moot because

4    the Government's calculation is $7,299,556 as set forth in the

5    amended presentence report.  The same thing is true as to the

6    amount represented for the FICA violations.  The presentence

7    report was revised to reflect an amount of $774,358.  And then

8    the Government objects to the two points that the probation

9    office allowed for acceptance of responsibility.  For reasons

10   that I am going to get into in a moment, I would sustain that

11   objection.

12          The defense made the following objections: As to

13   paragraph 21, that the defendant directed Person P to create

14   Beltway and the WR Group to insulate him and to conceal his

15   involvement from the United States Government, I would overrule

16   that objection.

17          As to paragraph 23, again, I would overrule that

18   objection.  That is to the statement in the presentence report

19   that the defendant used for his personal benefit the proceeds

20   of the Sri Lanka WR contract.  The defense contends that is

21   irrelevant to offense conduct, and as I said, I would overrule

22   that objection.

23          As to the tax loss set forth in paragraph 28, at

24   first the defense contended that that amount really should be

25   about $3.6 million arguing that his non income and expenses

should be considered.  I would overrule that objection.  To quote from the plea agreement paragraph 3, "The defendant admits he owes additional federal income taxes for the years 2012, 2013, 2014, and 2015 as reflected in Internal Revenue Service closing agreements executed by the defendant and his spouse on September 17th and October 4th, 2019, and agrees to pay the tax deficiencies, fraud penalties, and statutory interest obligations as acknowledged in the closing agreements prior to January 31st, 2020."

So the argument that the defense makes that the Government can't use the civil case agreed statement is not really contradicted by the language in the plea agreement. Furthermore, the claims that Person J's oral 75 percent clawback agreement rendered those funds not income, Mr. Zuberi acknowledged in his tax return that the money from J was income.  And the Government's evidence submitted in connection with this issue -- the contracts, invoices, and e-mails showing the purpose of the wire transfers in connection with services rendered by the defendant in connection with the Al Areen scheme and the spreadsheet explaining all of that -- is more than sufficient to meet its burden of proof even above and beyond what's in the plea agreement.

The defendant's claim that the U.S. Cares investor funds did not represent income again depends on his claim that the money wasn't fraudulently converted.  But that

```
 1    money still hasn't entirely been returned to the investors, and
 2    only some of it was returned when the defendant was threatened
 3    with legal action.  So I would overrule that objection.
 4              The defense objects in paragraphs 34 through 38
 5    and 98 to 110 the facts set forth regarding the underlying
 6    Federal Election Campaign Act charge including the
 7    determination that the total amount of contributions in
 8    violation of FICA is substantially less than $756,000 and
 9    contends that the correct amount is roughly $385,000 so that
10    there should be a 12-level rather than 13-level upward
11    adjustment.  I would overrule that objection.
12              The Government has met its burden by a
13    preponderance of the evidence that these -- the FICA violations
14    totaled roughly $774,000.  From 2012 to 2016 Mr. Zuberi made or
15    solicited $774,000 in 30 or more transactions, and some of
16    these transactions were reimbursed or paid in advance by
17    foreign nationals including, for example, a Kuwaiti corporation
18    and a Saudi corporation.
19              Exhibit 1, the spreadsheet the Government
20    prepared which is attached at docket No. 228 -- I won't go
21    through it, but it explains in detail as to several of the
22    alleged donors starting with A.A., for example, that she didn't
23    have the resources to make the contributions in her name.
24    There is no evidence submitted to support defendant's argument
25    that he could have loaned her money or given her money or
```

1   provided supplemental income to her to finance some of the

2   contributions.

3          As to person G.G., the defendant claims he

4   advanced money to campaigns, and because G.G. reimbursed him

5   later, this was only a technical violation.  But the Federal

6   Election Campaign Act prohibits just those advances.

7          There is also a dispute between the parties on

8   this issue about the salary reduction, but the 10 -- at one

9   point the 1099 form that Person P got showed that his total

10   salary in 2014 was $60,000 which undercuts the claim that he

11   made the various donations or contributions.

12          As to Person I -- person Margaret doesn't exist,

13   and the defendant made a payment under that name with his

14   credit card.  Without going into pages of detail about the

15   contributions that are all set forth in the papers, the

16   Government has met its burden of proof on this issue.

17          As to paragraph 38, the defendant objects to the

18   statement that $472,808 in alleged FICA violations were

19   reimbursed or paid in advance by foreign nationals.  And,

20   again, I would overrule that objection.  And the defense

21   objects to the sophisticated means enhancement applied on the

22   tax charge under Guideline Section 2T1.1.  I would overrule

23   that objection.  The defendant's tax fraud in this case did not

24   consist of simple underreporting as he claims.  And as one

25   example, from April 2012 to February 2013, he told Person C to

1   route all of the wire transfers into his foreign account, and

2   then he transferred the funds from the Dubai account to the

3   U.S. accounts in many smaller transfers to make it look like it

4   was transfers of wealth rather than income.  He concealed his

5   foreign accounts.  He didn't file the required FBAR reports.

6   So I would overrule that objection.

7        Then I have already discussed the discussion

8   about the FARA violations as non relevant conduct.

9        It seems to me that the overarching dispute

10  between the parties as to the guideline calculations is whether

11  the guideline range accurately captures the criminal conduct

12  here.  The Court is required to make a guideline calculation

13  but does not presume that the guideline calculation is the

14  appropriate sentence.

15       The defendant claims that his conduct is

16  accounted for by the two-point upward adjustment for the number

17  and scope of violations and that some of them -- he concedes

18  that some of them came from foreign sources although at the

19  same time he argues in connection with the evidence as to those

20  adjustments and the monies that came from foreign sources.

21       The defense also points to other cases to support

22  the contention that within guideline sentences are the

23  exception for these types of offenses and that below guideline

24  sentences are the norm.  And the Government has responded by

25  pointing out some significant differences between the cases

1   cited by the defense and this case.

2            So turning to the advisory guidelines, I find

3   that the advisory guideline range in this case is 121 to

4   151 months, in other words, 10 years and 1 month to 12 years

5   and 7 months; a one- to three-year period of supervised

6   release; a fine ranging from $30,000 to $20,207,334.

7            The conviction for obstruction of justice in the

8   single-count Indictment in case No. 20-155 -- that is the case

9   that was transferred from New York -- that conviction is

10  grouped with Count 3 of the Information in case No. 19-642 in

11  this district because Count 1 of the Information in the 20-155

12  case embodies conduct that is treated as an adjustment to

13  Count 3 of the Indictment in case 19-642.

14           The offense level is correctly calculated at 32.

15  The base offense level for the tax evasion charge which is

16  Count 2 is 24 under Guideline Section 2T4.1(j) because the

17  total tax loss from the years 2012 to 2015 equals $7,200,556.

18  And then two levels are added for the sophisticated means used

19  by the defendant under Guideline Section 2T1.1(b)(2) in

20  connection with the sophisticated means adjustment.  I note

21  that the defendant directed Person P to sign the Sri Lanka

22  WR contract and create Beltway Government Strategies and later

23  directed him to have WR, one of the alter ego companies of

24  Mr. Zuberi, to engage in lobbying and PR services, open bank

25  accounts for those companies, sign contracts on behalf of

1  Beltway with lobbyists and PR firms and directed who Person P

2  was to pay and not pay on behalf of Beltway and WR in order to

3  insulate and conceal his own involvement with those companies.

4  But the companies really were the defendant's alter egos.

5            Then there is a two-level upward adjustment for

6  obstruction of justice under Guideline Section 3C1.1.  The

7  defendant paid or offered to pay multiple witnesses so that

8  they would not fly to the United States where they could be

9  interviewed by law enforcement, urged him not to talk to law

10  enforcement officials, urged them to corroborate the

11  defendant's stories and provide statements that exonerated him.

12            He also at the outset of the case when --

13  investigation, I should say, when he changed counsel, the

14  e-mails that had been collected and retained as required were

15  given to Mr. Zuberi, and then new counsel had to report that

16  the majority of the e-mails were no longer in existence which

17  was done to -- not by counsel but by Mr. Zuberi to avoid

18  detection and responsibility.  So that would total an offense

19  level of 30 as to Count 2.

20            As to Count 3, the Federal Election Campaign Act,

21  the base offense level is 8 under Guideline Section 2C1.8(a).

22  There is a 14-level upward adjustment for the value of the

23  illegal transactions which is, as I have said, approximately

24  $774,000, plus two levels under Guideline Section

25  2C1.8(b)(2)(A) because illegal transactions were made by or

1  received from foreign nationals.  Some of the FICA transactions

2  were reimbursed or paid in advance by foreign nationals

3  including Kuwaiti corporation, a Saudi corporation owned by a

4  person with joint citizenship of the United Kingdom and

5  Saudi Arabia as some examples.  And then additional two levels

6  under Guideline Section 2C1.8(b)(4) because the defendant

7  engaged in 30 or more illegal transactions, plus two levels for

8  obstruction of justice under Guideline Section 3C1.1.

9            As I said, the defendant paid or offered to pay

10 various witnesses so they wouldn't come to the United States

11 where they could be interviewed or to talk to law enforcement.

12 So that totals an offense level of 28.

13            With the multiple count adjustment of 2, which is

14 added to the higher adjusted level which is 30, that results in

15 an offense level of 32.

16            The defendant's criminal history category is one.

17 He has no criminal history points.

18            The parties dispute whether the defendant should

19 receive a downward adjustment of either two points or three

20 points for acceptance of responsibility.  The probation

21 office's report calculated a two-point adjustment for

22 acceptance of responsibility.  The third point, of course,

23 there has to be a motion by the Government.  The Government

24 does not move for that third point and argues that there should

25 be no downward adjustment at all for acceptance of

1    responsibility.

2            Application Note 4 to this section says that an

3    enhancement under Guideline Section 3C1.1, which is appropriate

4    here, ordinarily means that the defendant hasn't accepted

5    responsibility for criminal conduct, but there may be

6    extraordinary cases where both acceptance of responsibility and

7    the obstruction of justice guideline could apply.  But this is

8    not an extraordinary case in that sense.

9            The defendant did plead guilty before Indictment

10   as the defense points out, but there are a number of things in

11   addition to the conduct of persuading witnesses and paying

12   businesses not to come to the United States and destroying the

13   e-mails.  He has not complied with the requirements of his plea

14   agreement.  He hasn't paid back the amounts in back taxes or

15   not the total amounts.

16           As I said, he has destroyed relevant e-mails and

17   tried to prevent witnesses from speaking to law enforcement

18   offering to repay their, quote, "investments" if they would

19   meet him outside the country in Dubai, for example.

20           The guideline with a criminal history category of

21   one and an offense level of 32, as I said, the guideline range

22   is 121 months to 151 months.

23           And now I would turn to the 3553(a) factors which

24   I will discuss at length.  But before we do that, I will

25   conduct the sealed session which should be fairly brief.  I

 1    have read the materials submitted by both sides in connection

 2    with those issues, but I will permit both sides to argue

 3    briefly as to that.

 4              So all of those in the courtroom who do not have

 5    a security clearance must leave.

 6              Sir, you can take your mask off if you stand

 7    right at the lectern behind the shield while you're speaking.

 8              AUDIENCE MEMBER:  Can you hear me now?  My name

 9    is Brian Melley, B-r-i-a-n M-e-l-l-e-y, reporter with the

10    Associated Press.

11              I respectfully object to the closing of this

12    proceeding to the public and the news media.  The 1st and

13    14th Amendments of the U.S. Constitution guarantee the right to

14    open court proceedings except in cases of unusual nature.

15    Proceedings should only be closed as a last resort and only

16    after showing compelling interest to require that no less

17    restrictive alternative is available.  Before you rule on this

18    motion, I request a recess to let my employer and our attorney

19    decide if we want to be heard on this matter.

20              THE COURT:  Well, the compelling interest here --

21    and I think the record is clear -- is that there are a few

22    matters in this case that were not filed on the public docket

23    because they are classified for national security interests,

24    and that is the compelling interest I find justifies the

25    closing of the courtroom.  I expect this portion of the

1  argument to be brief in relation to all of the other matters

2  that will be discussed on the record, but these documents are

3  classified, and they cannot be viewed or discussed by anyone

4  who doesn't have the necessary security clearance.  I am going

5  to deny the request for a recess.

6           AUDIENCE MEMBER:  Thank you for hearing me.

7           (Sealed proceedings were held and

8           reported but not included herein.)

9           THE COURT:  All right.  We are on the record, and

10  for the reasons that I stated earlier we are -- we conducted a

11  session in a sealed courtroom because of the interests that I

12  identified and that were also identified in the minute order

13  issued as docket No. 302.  All right.

14           Now we're going to turn to the discussion of the

15  3553(a) factors.  The Court makes the following individualized

16  determination based on the facts of this case.

17           Starting with the nature and circumstances of the

18  offense -- and some of them I have already described earlier in

19  connection with the guideline calculations.  As to Count 1 in

20  the 19-642 case, the FARA violations, the defendant, starting

21  in late 2013, met with officials of Sri Lanka and negotiated an

22  agreement for his company Avenue Ventures for a specific

23  purpose, for the company to lobby and make public relations

24  efforts to rehabilitate Sri Lanka's image in the United States

25  focusing on changing U.S. government policies and improve

1   public perception regarding Sri Lanka's persecution of its

2   minority Tamils population.

3            In April of 2014, the WR Group contracted with

4   Sri Lanka Central Bank for strategic advice, consultation, and

5   so forth requiring payment of eight-and-a-half-million dollars

6   to WR Group.

7            The defendant acted as an unregistered agent of

8   Sri Lanka having Person P sign that contract, create Beltway

9   Strategies -- Beltway Government Strategies and WR in order to

10  lobby and provide public relations and conduct other activities

11  such as opening bank accounts and making payments.  And having

12  Person P do that was done to hide the defendant's own

13  involvement with Beltway and WR who were actually the

14  defendant's alter egos.

15           Starting December of 2013 until October of 2014,

16  the defendant acted as an unregistered agent of Sri Lanka

17  soliciting members of congress to accept all expense paid trips

18  to Sri Lanka, et cetera, negotiating contracts with lobbyists,

19  coordinating and participating in meetings between the

20  Sri Lanka delegation and members of congress or staff.

21           In 2014 Sri Lanka wired four-and-a-half-million

22  dollars to the defendant's personal bank account and between --

23  well, I think up until September of 2014 another $2 million to

24  the WR bank account.  And then the defendant directed Person P

25  to transfer the majority of these funds into the accounts the

1   defendant controlled and used much of the money for his

2   personal benefit.

3           He failed to register under the Foreign Agents

4   Registration Act, and he caused Person P to file the FARA

5   regulatory statements, identified Beltway as a Sri Lankan

6   agent.  The registration statement contained false statements

7   and had material omissions.  Both of the FARA registration

8   filings failed to report any of the money that Beltway received

9   from Sri Lanka.  The money disbursed to companies under the

10  defendant's control were the monies disbursed to subcontractors

11  that had engaged in the Sri Lanka lobbying and the PR efforts.

12          On August 14 defendant filed a short form FARA --

13  August 14 of 2014 filed a short form FARA registration

14  statement under penalty of perjury with false statements and

15  material omissions including that he was only a consultant for

16  Beltway, that he merely received a salary from Beltway, not

17  based solely on services rendered to the foreign principal

18  when, in fact, he not only got a salary from Beltway but

19  six-and-a-half-million dollars from Sri Lanka for lobbying and

20  public relations work.

21          He also stated that he had not made any

22  contributions of money from his own funds for any political

23  election when actually he made dozens of contributions from his

24  own funds.

25          September 15, 2015, he filed a FARA registration

1   statement and a supplemental statement for himself with

2   material false statements and material omissions, again,

3   claiming he provided no services to Sri Lanka after

4   September 2014 when he told Sri Lankan officials that a

5   congressman would visit and attached a letter from his attorney

6   with false statements about his limited involvement and that

7   FARA registration was not required because he only did non

8   political work in furtherance of commerce.

9            As to the tax violations, which is Count 3 in the

10  Information in the 19-642 case, on April 15, 2015, he filed a

11  tax return stating had he total income of $558,000.  He didn't

12  include the payment of six-and-a-half-million dollars for

13  services rendered to Sri Lanka under the Sri Lanka WR contract.

14  He failed to file a tax return for 2012.  Between 2012 and

15  2016, he solicited more than $1.3 million in campaign

16  contributions which he converted for his personal use and

17  failed to report on his taxes.

18            In 2013 and 2015, he provided inaccurate

19  information that resulted in substantial underpayment of income

20  tax due.  And the total for the years 2012 through 2015,

21  7,299,000 -- $7,299,556.

22            Moving on to the Federal Election Campaign Act

23  violations, in 2015 the defendant made contributions in the

24  names of others.  He reimbursed contributions made by others

25  and received reimbursement from others for contributions he

1    made in connection with federal elections.  He made

2    contributions in the names of others by making online

3    contributions with his credit cards.  Between 2012 and 2016, he

4    made or solicited more than $250,000 but less than

5    one-and-a-half-million dollars in contributions, as I said

6    earlier, from a Kuwaiti corporation, from a Saudi corporation,

7    residents of the United Kingdom, and Switzerland, the

8    obstruction of justice count, which is the single count in the

9    20-551 case from the Southern District of New York.

10                When the U.S. Attorney's Office began its

11   investigation in 2016, they attempted to interview the

12   defendant and issued grand jury subpoenas to companies under

13   his control.  In February of 2019 the press reported on a

14   subpoena issued by the Southern District of New York seeking

15   records of contributions to the 2017 Inaugural Committee

16   mentioning the defendant by name.  February of 2019 the

17   Government, that is, the U.S. -- I think it was the

18   U.S. Attorney's Office in New York at that time -- told the

19   defendant's attorneys it would proceed with the investigation

20   and possible indictment.

21                The following things occurred after the defendant

22   became aware of the investigation that happened -- began in

23   2016, and the U.S. Attorney's -- law enforcement attempted to

24   interview the defendant.

25                As to L.L., that person issued a $50,000 check to

the defendant for an investment in something called RadPad, and starting in August of 2016 the defendant diverted $10,000 of that to his personal bank account and then in 2017 diverted another $20,000 to another bank account that he used for payment of his California state income taxes.

In November of 2016, L.L. agreed to contribute $50,000 to the defendant for, quote, "Taking him to the White House."  When that didn't happen, L.L. wanted the money returned, and the defendant agreed to meet him in Los Angeles but refused to discuss the refund check while the two of them were in the car.  And he told L.L. that he was being followed by the FBI and asked L.L. not to talk to the FBI and said that he would get him a lawyer if the FBI contacted him.

Then he gave L.L. a check for $50,000.  L.L. misplaced it, asked for it again as well as continuing to ask for stock share certificates showing that he had made the $50,000 investment in RadPad.

In July of 2017, the defendant gave L.L. a $50,000 check with a notation "investment payback" on the memo line, and again, in February of 2019, L.L. still wanting a stock certificate, the defendant gave him another $50,000 check.

As to Person C, from May of 2012 to February of 2016, C wired $1,533,400 to the defendant's bank account for the purpose of making contributions to U.S. political campaigns

1   in the 2013 Presidential Inaugural Committee.  The defendant

2   donated $480,000 to campaigns and covered the remainder --

3   converted the remainder of that money for his personal use

4   without Person C's knowledge.  Person C wanted a refund because

5   the defendant failed to make good on promises that business

6   opportunities would develop as a result of the contributions

7   that were to be made.

8           So in May of 2018 the defendant met with Person C

9   at a hotel in Dubai, took Person C's cell phone and put it in

10  another room because, quote, "The FBI might be listening,"

11  searched Person C to make sure he wasn't wearing a wire, and

12  told him not to enter the United States and promised to hire a

13  lawyer for Person C so that they could, quote, "Be on the same

14  page."

15          July of 2018 the defendant wired Person C

16  $100,000 and promised to send additional funds.  And in

17  February of 2019, Person C told the defendant that the FBI

18  tried to subpoena him, and defendant again said, let's meet in

19  Dubai.

20          The defendant continued to ask him -- Person C to

21  meet with him in Dubai because if -- because otherwise the

22  defendant would go to prison.  And the defendant also told

23  Person C repeatedly not to say anything to the FBI.  He offered

24  him $1 million and later $2 million to come to Dubai.  That is

25  at least part of the criminal conduct covered in that count.

 1            There is also the activity with the U.S. Cares

 2   investors.  From September of 2013 to March of 2014, persons or

 3   entities L, M, N, and J invested about 7 million in U.S. Cares

 4   which was for the purpose of applying for a license from the

 5   Office of Foreign Assets Control permitting U.S. Cares to

 6   export food, medicine, and medical supplies from the

 7   United States to Iran.  The defendant did not transfer any of

 8   these funds from the investors into a U.S. Cares capital

 9   account.  Instead, he converted most of it to his benefit with

10   some portion used for costs for retaining counsel and

11   submitting the application to the OFAC.

12            Person M asked the defendant to return his

13   $2 million contribution because the defendant didn't properly

14   invest it.  In April of 2014, the defendant signed a contract

15   agreeing to refund half of M's investment and sent him the

16   money.

17            In April of 2018, the defendant wired $1 million

18   to N and to J, and then after that N, M, and J issued positive

19   statements about the defendant to U.S. Cares conflicting with

20   the previous statements they had made of taking their

21   investments and not living up to the contract.

22            As to the obstruction of justice -- in addition,

23   as to the obstruction of justice, in November of 2017 the

24   Government issued a subpoena for corporate e-mails covering the

25   period from 2010 through 2017.  And in January of 2018, defense

1  counsel -- previous defense counsel told the Government there

2  were thousands of e-mails in the accounts in defendant's name

3  and that 14 more accounts -- e-mail accounts were accessible.

4         None of those e-mails were produced at that time.

5  Then they were returned to the defendant when he changed

6  counsel.  And all that was produced in 2019 -- rather than what

7  was described by previous counsel, all that was produced in

8  2019 were personal and noncorporate e-mails, and the latest one

9  was dated in August of 2016.  These deleted e-mails were

10 relevant to the Government's investigation.

11        That is only some of the criminal conduct that is

12 covered by the defendant's conviction on those counts.

13        The history and characteristics of the defendant,

14 the second factor under 3553(a), the defendant is 50 years old.

15 He holds a Bachelor's degree and a Master's degree from USC.

16 He is an only child.  Both of his parents are deceased.  His

17 father died in 2011, his mother in 2016, and by all accounts he

18 cared for them very, very well throughout their lives and

19 during their final illnesses.

20        He immigrated to the United States when he was

21 4 years old for medical treatment, and he lived in New York

22 with his parents until moving to California in 1993 to attend

23 his undergraduate studies.

24        After he obtained his Bachelor's degree, he

25 worked for TransAmerica in various countries.  He then, while

 1    still working for TransAmerica, got his MBA from USC.

 2                He married in 2009 to Willa Rao.  They have two

 3    children.  I believe they're aged now 5 and 3.  He has some

 4    physical illnesses.  He suffers from diabetes.  He also has

 5    some sleep and allergy disorders.

 6                There are many letters that have been submitted

 7    in support of the defendant recounting that he has been a

 8    generous donor to various charitable causes.  He has a total

 9    net worth of over $32 million and a very large positive monthly

10    cash flow mostly from rental properties.  So that would not be

11    interrupted if he is incarcerated.  And it goes to imposition

12    of a crime.

13                The need for the sentence to reflect the

14    seriousness of the offense, promote respect for the law, and

15    provide just punishment.  In the presentence reports, the

16    probation office characterized the offenses here as

17    transparency offenses and nonserious technical reporting

18    violations, and they recommended a 27-month downward adjustment

19    from the low end of what they calculated to be the sentencing

20    range.

21                In the Court's view, these are not minor

22    reporting offenses.  The defendant funneled millions of dollars

23    from foreign persons and foreign corporations to U.S. political

24    campaigns.  He did it repeatedly on behalf of various foreign

25    interests.  This is far from a case of an unsophisticated

1  person who made donations without making the proper

2  disclosures.  Rather, it's a case with a highly educated man

3  who falsely told foreign principals and foreign corporations

4  that this is the way America works, by buying influence through

5  large and, for the most part, illegal contributions by foreign

6  persons and corporations.

7           Not only did he funnel illegal foreign

8  contributions, but once he learned he was being investigated,

9  he attempted to silence some of the witnesses to his wrongdoing

10 warning them not to enter the United States so that they

11 couldn't be interviewed by the FBI, promising to pay them, and,

12 in fact, some of them paying them large sums of money if they

13 would meet him outside of the United States, and also

14 destroying incriminatory evidence.

15          He took money from so-called investors but

16 diverted it to his own use, and then he didn't report it as

17 income, and he didn't pay taxes on it.  All of these are

18 serious offenses.  The FARA offenses are not accounted for in

19 the guideline range, but that wrongdoing is also significant.

20          When we hear lamentations about the relatively

21 low voter turnout in the United States elections and statements

22 that voters feel there is no point in voting because the system

23 is corrupt and it's rigged and that lawmakers are influenced

24 only by money, that illustrates or demonstrates how important a

25 case like this is because, when such wrongdoing is uncovered,

1   in this case among many other things, is an illustration of how

2   much work is involved to uncover these kinds of financial

3   crimes -- it's an enormous amount of effort -- then a sentence

4   below the advisory guideline range, as the defense urges, that

5   is not just punishment.

6          The next 3553(a) factors is adequate deterrence,

7   the need for the sentence to provide adequate deterrence and to

8   protect the public.  This is -- this is the defendant's first

9   conviction.  He has, as I said, a history of generosity to

10  charitable causes and apparently has otherwise lived a

11  law-abiding life, taking care of his ill parents, providing for

12  his family, and perhaps it's unlikely that he will reoffend.

13         But the deterrence factor also applies to

14  deterrence in a broader sense, and that is to general

15  deterrence, to deter others who might be inclined to commit

16  these kinds of offenses.  And the need to deter this kind of

17  wrongdoing is particularly important, again, in this kind of a

18  case where there was a course of conduct whose hallmarks were

19  repeated, planned, schemed wrongdoing.

20         It was not a spur-of-the-moment crime of

21  opportunity, the classic example being someone who grabs the

22  cash that falls off the back on the Brinks truck on its way to

23  the bank.  In 21 years as a district judge, I have never had a

24  case like that where somebody grabbed the cash from the Brinks

25  truck.  But I have had a lot of cases where the person was

1    being prosecuted on what I would call a crime of opportunity or

2    impulse.  This is not that case.

3              The defendant deceived investors and would-be

4    donors by soliciting funds with a promise to buy access to the

5    American lawmakers saying this is how it's done in America, and

6    then he didn't report that he was acting as an agent for

7    foreign countries or non U.S. citizens.  And he funneled

8    foreign contributions to political campaigns and politicians,

9    and he syphoned off from the funds he received for his own use,

10   and then he didn't pay millions of dollars of taxes on the very

11   large amount of money he made doing this.

12             These are the sorts of crimes that are complex

13   and difficult to investigate and prosecute.  While it may be

14   impossible to measure what actually deters crime, given the

15   amount of sophistication and planning that went into this --

16   these crimes as opposed to a one-off type of offense where it

17   is a crime of opportunity and no planning is involved, the

18   sentence in this case must be sufficient but no longer than

19   necessary to impress upon others who are in a position to

20   commit crimes that threaten a free and fair democratic

21   electoral process, that these are serious offenses, not merely

22   reporting failures.  So I view both deterrence and the need to

23   protect the public as important factors in this case.

24             Finally, the applicable 3553(a) factor that I

25   will discuss is the need to avoid sentencing disparity.  So the

1    advisory guidelines are used for this purpose, and here, by my

2    calculation, the guidelines counsel a sentence between

3    121 months, which is just about 10 years, to 151 months or

4    12 years and 7 months.  But the guidelines here do not account

5    for the FARA violations as I have said before.  Those are

6    serious offenses in this case.

7              In addition to what I have already said, the

8    Bahraini government on the Al Areen resort paid money in the

9    effort to feat a proposed resolution in congress denouncing

10   repression of speech and civil rights in Turkey, the defendant

11   acting on behalf of the Turkish government or Turkish citizens,

12   at least made strenuous efforts with members of congress to

13   defeat this proposed resolution while never registering as a

14   foreign agent.  Again, those are just some examples.  There are

15   many others.

16             So because of the lack of accounting for the FARA

17   violations which are very serious and the other relevant

18   uncharged conduct, I consider the sentence outside the

19   guideline range in this case, above the guideline range.  But

20   having considered all of the evidence submitted by both sides

21   and all the arguments including -- well, I haven't heard all of

22   the arguments yet but all the written arguments including the

23   mitigating evidence submitted by the defense, I am inclined to

24   sentence the defendant in this case to 144 months in custody,

25   restitution in the amount of $15,705,080, and a fine of

```
 1   $1,750,000, and three years of supervised release.
 2                   We will also need to discuss with counsel, after
 3   you have made your arguments, a self-surrender date and perhaps
 4   some proposed conditions modifying the current conditions of
 5   release given the defendant's -- I know he surrendered his
 6   passport and has posted a very large cash bond or amount, but I
 7   still would like discussion on additional measures to be taken
 8   before a self-surrender date.
 9                   Again, to confirm, there are no victims that wish
10   to address the Court?
11                   MR. DANIEL O'BRIEN:  Yes, Your Honor.
12                   THE COURT:  All right.  Mr. O'Brien, are you
13   going to argue for the defense?
14                   MR. TOM O'BRIEN:  Thank you, Your Honor.  I
15   appreciate the very detailed tentative from the Court.
16                   THE COURT:  Mr. O'Brien, if you would stand at
17   the lectern.
18                   MR. TOM O'BRIEN:  I apologize.
19                   THE COURT:  Thank you.
20                   MR. TOM O'BRIEN:  Your Honor, we appreciate the
21   details the Court has provided in its tentative to allow us to
22   focus with the Court's permission.  I understand that the
23   hearing has been lengthy already.  We have some very narrow
24   arguments we would like to bring to the Court's attention.
25                   THE COURT:  As much time as is needed within
```

1    reason.

2                   MR. TOM O'BRIEN:  As always, Your Honor.  Thank

3    you.

4                   Following that, there are several individuals

5    that would like to address the Court briefly if the Court would

6    permit, and I can identify that in a moment.

7                   THE COURT:  Of course the defendant has the right

8    to allocute.

9                   MR. TOM O'BRIEN:  And also the defendant would

10   like to address the Court at the very end before the Court

11   imposes sentence.

12                  If I could then ask Mr. Evan Davis to address

13   narrow points on the tax issue.

14                  THE COURT:  That is fine.  So when you say other

15   persons, you mean other counsel.

16                  MR. TOM O'BRIEN:  Yes, Your Honor.  There's one

17   other counsel -- Mr. Lawrence has a very narrow issue he would

18   like to address the Court on FARA.  I suppose by "other

19   persons," civilians in the audience who essentially want to

20   speak up on behalf of the defendant if the Court would allow.

21   Some of them have already submitted a letter.  One has not.

22                  THE COURT:  I would not -- other than the

23   defendant's right to allocute, I have read everything that has

24   been submitted and taken it into consideration.  I would not

25   permit any further members of the public to speak.

1          MR. TOM O'BRIEN:  Very good.  Thank you,

2    Your Honor.

3          MR. DAVIS:  Can the court reporter hear me with

4    my mask on?

5          Thank you, Your Honor.

6          So because the tax guidelines are, in essence,

7    the base of the guideline computation and there is one

8    particular enhancement that the Court determines, which is

9    sophisticated means, the things that the Court pointed to as

10   the basis for its finding that caught my attention were the use

11   of the foreign bank account, and the Court also referenced the

12   fact that Mr. Zuberi did not file an FBAR form.

13          I know, if you look at the Government's papers,

14   it would look like Mr. Zuberi -- there is a footnote in their

15   tax filing.  It would look like Mr. Zuberi had a history of

16   filing FBARs which, in the instance of 2013 through 2016, if he

17   doesn't file it when he has filed it before, it is logical to

18   assume that it was an intentional act.

19          The Government, after we repeatedly told them

20   Mr. Zuberi doesn't think he ever filed an FBAR report, doesn't

21   remember that, the Government about a year later produced a

22   document which was the FBAR which clearly does not include his

23   signature, and I think the Government agrees it was not his

24   signature.  It was a company by a letter that said here is the

25   FBAR.  We will get you a wedding signature later.

 1          For some reason the Government believes that

 2   Mr. Zuberi was involved in that, but I don't think there is any

 3   basis for the Court to reach that conclusion.  I have a copy of

 4   the document although I don't think it is disputed by the

 5   Government.

 6          So I wanted to focus the Court on that because

 7   one of the linchpins of the sophisticated means enhancement is

 8   the use of a foreign account.  Obviously, as the Court just

 9   stated a few minutes ago, four-and-a-half-million dollars went

10   into his own name which is sort of quintessentially not

11   sophisticated means from a tax perspective if you put it into

12   your own account.

13          So certainly the lion's share of the money from

14   Sri Lanka, for example, that the Government pointed out went

15   through foreign accounts was an account in his own name.  You

16   have then a series of smaller transactions which I think, if

17   the Government had contacted the bank, they would have found

18   out that that was the daily limit.  Mr. Zuberi travels, as we

19   all know, around the world all the time.

20          So when the Court was concluding that sending it

21   in $40,000 increments was indicative of, in essence, a

22   sophisticated scheme, I don't think that the evidence supports

23   that.  Given that those two points make a years' long

24   difference at least in the guideline calculation, we wanted to

25   bring that to the Court's attention that I think some of the

1    facts that the Court is looking at as essential to that finding

2    I think are not supported in the record.

3                    THE COURT:  Well, really, though, all you are

4    arguing is that not all of the transactions involved foreign

5    bank accounts.  It is undisputed that many of them did.

6                    MR. DAVIS:  Certainly.  As we briefed -- I don't

7    want to go through the briefs again.  But the element in terms

8    of sophisticated means is not just the use of the accounts.  It

9    is the use of the accounts in order to hide his identity.  That

10   is critical to the process because the mere use of a foreign

11   account is not in and of itself sufficient for a sophisticated

12   means finding.  So that point.

13                   The second point goes to the fine.  So I didn't

14   hear the Court say that it was going to impose Casa prosecution

15   which --

16                   THE COURT:  There is a question I have for the

17   Government because that is required.  So if you want to address

18   it, go ahead.

19                   MR. DAVIS:  I would.  Clearly that is contrary to

20   law, Your Honor.

21                   THE COURT:  You mean the Casa prosecution or --

22                   MR. DAVIS:  For someone who has pled guilty, it

23   is clearly contrary to law.  I suspect the Court has never

24   imposed it in a tax case in which someone has pled guilty.  So

25   the Government can withdraw it, or I certainly can point the

```
 1   Court to United States versus --
 2                 MR. DANIEL O'BRIEN:  Your Honor, I trust
 3   Mr. Davis's representations on this.  I'm unaware of the law
 4   that he cited, but the fact that he is prepared to cite that is
 5   contrary to law and that it is not applicable in a situation
 6   where defendant has pleaded guilty, the Government would
 7   withdraw that request.
 8                 THE COURT:  There was no detail involved.  There
 9   was a request, but that is what I was going to ask the
10   Government about.  I think you can move on.
11                 MR. DAVIS:  Thank you, Your Honor.
12                 So the final point goes to the fine.  What I
13   would point to the Court -- I know you are looking at the PSR
14   to say that there is $30 million of assets.  So you have
15   Mr. Zuberi goes -- he's paid about $10 million to the IRS which
16   would have brought that number down because that occurred
17   after.
18                 THE COURT:  You mean after the --
19                 MR. DAVIS:  After the PSR.
20                 THE COURT:  After the time of the PSR.
21                 MR. DAVIS:  He obviously has $3 million in his
22   account.  Basically it's a bond that the parties have agreed,
23   if he hasn't already fully paid, would go to the IRS.  Because
24   interest runs, he has about another -- let's say it will be
25   17 million instead of 16 million.  So there is about another
```

1    4 million left to pay to the IRS.  The FTB is already looking

2    at him.  Usually you pay about a quarter to the FTB.  So he

3    will be looking at -- his tax bill alone --

4              THE COURT:  You are referring to the California

5    Franchise Tax --

6              MR. DAVIS:  Correct, Your Honor.  So his tax bill

7    alone is going to exceed the amount of unreported income.  It's

8    going to be well north of $20 million when all is said and

9    done.  He has sold many of the assets that we are talking about

10   in order to get down to the $13 million.  He has a number of

11   loans, some of which post-date the PSR.  I asked -- I don't

12   know that we need testimony, but I asked the accountant that we

13   have been using, in essence, is Mr. Zuberi above water when you

14   count, for instance, money he still has to pay back to the

15   U.S. Cares investors?  He still owes his lawyers money,

16   et cetera.  The answer is he is way underwater.

17             So our position is a fine would be inappropriate

18   for Mr. Zuberi certainly if it's based on the idea that he is

19   sitting on many millions of dollars of assets.  From our

20   perspective, he is underwater, and it would be inappropriate to

21   impose a fine on him at all, Your Honor.

22             So those are all the arguments that I have,

23   Your Honor.

24             THE COURT:  Thank you.

25             MR. TOM O'BRIEN:  Mr. Lawrence will address the

```
 1    Court briefly, Your Honor, on the FARA issue.

 2                 THE COURT:  Thank you.

 3                 MR. WARRINGTON:  Good afternoon, Your Honor.

 4    David Warrington on behalf of Mr. Zuberi.

 5                 Just briefly, when Your Honor was going through

 6    the issue with regard to the relevant conduct on the FARA

 7    issue, I think the Court referenced the sentencing guideline

 8    requirement test, and I believe that it referenced 3D1.2(b).  I

 9    believe the correct reference should have been 3D1.2(d) which

10    would not allow the other countries to be used as relevant

11    conduct in this case.

12                 THE COURT:  For guideline calculation purposes.

13                 MR. WARRINGTON:  I'm sorry?

14                 THE COURT:  For guideline calculation purposes.

15                 MR. WARRINGTON:  Correct, Your Honor.  I raise

16    that point.  It has been briefed, this specific issue.  So I

17    won't belabor it.  I'm mindful of the Court's time.  I am

18    mindful of the Court's time, and I can give you a document.

19    It's docket entry 122, pages 29 and 30.

20                 THE COURT:  I have read that more than once.

21                 MR. WARRINGTON:  Okay.  Thank you.

22                 THE COURT:  Thank you.  All right.

23                 MR. TOM O'BRIEN:  Last, Your Honor, with the

24    Court's permission for a moment or two, I would like to address

25    the Court's tentative on acceptance of responsibility and the
```

 1    denial of the three points.  If I heard the Court correctly,

 2    the Court focused on obstruction of justice and the fact that

 3    the defendant paid off witnesses and e-mail destruction and

 4    other things.  I know it was a partial list by the Court in

 5    order to negate the early sentencing responsibility.

 6              The Government initially had raised the frivolous

 7    argument claim.  We addressed that in our papers.

 8              THE COURT:  I'm not -- I'm not characterizing the

 9    arguments that were made as frivolous.

10              MR. TOM O'BRIEN:  I appreciate that.

11              THE COURT:  So that is not part of my -- the

12    basis for my decision on acceptance of responsibility.

13              MR. TOM O'BRIEN:  I understand.  I'm just going

14    to ask the Court to consider -- and it is kind of a policy

15    argument and part of a case law argument -- the things the

16    Court has focused in on to negate his early acceptance

17    responsibility are conduct committed by the defendant prior to

18    his pleading guilty and under some of the case law --

19              THE COURT:  Excuse me for interrupting you, but

20    there is one thing -- and I believe I mentioned this.  Maybe I

21    didn't -- his post-guilty plea, and that is his failure to

22    comply with the terms of the plea agreement in terms of

23    payments.

24              MR. TOM O'BRIEN:  Thank you, Your Honor.

25              If I may then, because the Court did mention the

1 earlier conduct, there is case law, document 136, we submitted

2 to Your Honor with different districts, and the Court needs to

3 make kind of a fine line between preplea, et cetera.

4 　　　　　So if the Court's focus on not allowing the three

5 points based on his inability to pay the $16 million, I would

6 urge the Court to consider, as Mr. Davis indicated, the client

7 is about 13 million into the 16- or 16-and-a-half-million

8 dollars he owes.  He's almost there.

9 　　　　　We had anticipated very robust discussions with

10 the Government prior to his plea that he would be allowed to

11 travel internationally where a lot of assets are.  The

12 Government granted permission on several trips for the

13 defendant to travel overseas and start to liquidate assets

14 overseas.  At some point soon thereafter, the Government

15 stopped granting permission which put the client in the bind of

16 now trying to unload real estate.  And of course the pandemic,

17 we can blame nobody on that.  That also had an effect on his

18 ability.  He has conducted sales on some of these properties,

19 and he is awfully close, Your Honor.

20 　　　　　Part of the negotiations, the client did sign

21 quitclaim deeds which are essentially held in the pocket of the

22 Government.

23 　　　　　THE COURT:  Right.  And that was -- in part that

24 was covered in the plea agreement, and there was some

25 subsequent negotiations and agreements.

 1          MR. TOM O'BRIEN:  Yes.  My point being,

 2    Your Honor, the defendant has done everything I believe in his

 3    power with an inability to travel to liquidate assets, being

 4    stuck here in the United States when the Government changes

 5    their mind for whatever reason.  They have the ability to do

 6    so.  We understand that.  And then he liquidated the best he

 7    could.  And he is awfully close.  To be able to raise that

 8    amount of money to date I think is actually a positive rather

 9    than most defendants probably before Your Honor who show up and

10    nothing has been paid and U.S. Attorney's Office five years

11    down the line has to go after him.

12              There are liens on the remaining properties from

13    the IRS.  So the IRS will get their money.  And the defendant

14    is working hard to finish that.  That was one of his goals is

15    to get this done for sentencing.  He worked really hard to do

16    that.  So if that is the reason, I would ask the -- urge the

17    Court to please consider on the acceptance of responsibility

18    part.

19              The last, I guess, is the policy thing.  I

20    mentioned that we asked defendant to plead guilty as early as

21    possible for all the obvious reasons to save the Court and

22    hardworking court staff time, to save the U.S. Attorney's

23    Office and all the federal agencies all the time it takes to

24    prepare for trial.

25              In this particular case, the defendant pled to an

1   Information twice.  Not even an Indictment.  He couldn't

2   frankly plead any earlier or accept responsibility any earlier

3   than he did here.  One, of course, is with CDCA's three-count

4   offer, and then kind of surprisingly a few months later SDNY

5   comes up and demands that he pleads to a count which this

6   office here in the plea agreement said we are not going to

7   charge you with.  Same offense conduct.  So the defendant says,

8   okay, I will plead to that count too.

9            Now, I know they are different offices and

10  Los Angeles is not tied into New York other than the Department

11  of Justice umbrella, but it is the Department of Justice.  And

12  to force him to plead guilty to another count, there is a sense

13  of unfairness on that that I don't think was considered by this

14  office.  That being said, again, Your Honor, he pled to that

15  count and an Information as well.  He couldn't have done it any

16  earlier.

17           As far as I'm aware, all the conduct since his

18  plea in December of 2019 before Your Honor and the spring of

19  2020 before Your Honor again on the New York case, the 20-155,

20  the client has been law-abiding.  He's traveled out of the

21  country twice to try to sell assets, and then that stopped.

22  He's been selling assets.  He's been cooperating with us.  All

23  the other factors that the Court has considered, he's been

24  doing those things.

25           So in order to accept -- the Court has mentioned

1    sending the message to the community, and I think that is

2    right.  I think that is one of the factors the Court considers

3    in imposing the sentence.  The other is sending the message to

4    the people in the community who are thinking about pleading

5    guilty or not.

6              And for someone -- the only thing that defendant

7    really gets, as the Court is aware, instead of dragging this

8    Court through God knows -- I couldn't count how long this case

9    would have taken but a long time.  If we forced the Government

10   to its burden of proof, the client would have gone through

11   trial and would have lost three points, no acceptance of

12   responsibility.  I understand that.

13             Here he has pled guilty early preIndictment, no

14   grand jury in two different offices.  And I think he is

15   entitled to acceptance of responsibility.  I think that is a

16   fair thing for the defendant based on all the other factors the

17   Court has considered.  I would ask the Court to adopt the

18   probation officer's recommendation and move from there.

19             Other than that, I would submit, Your Honor, and

20   defer to the Government.  And after that, again, the -- my

21   client would like to allocute to the Court.

22             THE COURT:  All right.  Mr. Daniel O'Brien.

23             MR. DANIEL O'BRIEN:  I will try to take these

24   arguments in reverse order.

25             The other Mr. O'Brien talks about policy

1    interests and that the Government should encourage people to

2    resolve their cases preIndictment.  And as the Government has

3    said in its briefings, it agrees.  It's important to try to not

4    burden the Court with unnecessary trials, and a person who

5    pleads guilty preIndictment is typically given quite a lot of

6    clemency and appropriately so.

7              The Government would have taken a very different

8    posture with respect to his acceptance of responsibility had

9    the defendant simply complied with the terms of the bargain

10   that he struck with the Government in October or November of

11   2019.  But what did the defendant do after signing the plea

12   agreement?  Well, 15 months later he still hasn't paid his

13   taxes despite sitting upon over $30 million in real estate here

14   in Southern California.

15             Now, I'm not sure if it was Mr. O'Brien who said

16   this with regard to selling things at fire sales, but these

17   aren't fire sales.  The sales that I have seen, the defendant

18   is actually making a profit on these sales compared to what he

19   paid for the properties, and these properties were just

20   purchased, you know, a few years ago.

21             THE COURT:  When you say $30 million in real

22   properties in Southern California, is that what you meant to

23   say?

24             MR. DANIEL O'BRIEN:  Yes.  That is in the

25   presentence report.

1          THE COURT:  That is what I am looking up right

2    now because it was my --

3          MR. DANIEL O'BRIEN:  Well, it was at the time of

4    the signing of the plea agreement.  I'm sorry.

5          THE COURT:  All right.  That's okay.

6          MR. DANIEL O'BRIEN:  In addition, despite

7    agreeing to file truthful Foreign Agent Registration Act

8    statements to ensure public transparency, he's filed none.  He

9    hasn't even filed an amended FARA statement with respect to the

10   count of conviction dealing with Sri Lanka, and these are

11   continuing offenses.  To this day, offenses are being committed

12   by the defendant because he is refusing to register under FARA.

13         I know the Court said that -- something to the

14   effect that it was not embracing the frivolous argument theory

15   as a reason for denying acceptance of responsibility, but I

16   think it is inescapable that there is a persistent lie that has

17   been represented by Mr. Zuberi that he invested millions and

18   millions of dollars in the Al Areen Resort & Spa.  There is no

19   evidence of any such investment.  Whether it was

20   70 million or only 35 million depends on which document he is

21   representing the investment.  There is no investment.

22         And to this day I think he has filed false and

23   misleading information to the Court.  I spoke of the -- I spoke

24   with respect to OPIC during the nonpublic segment of this

25   hearing.  One of the charitable works that the defendant is

1   claiming credit for in his final sentencing brief has to do

2   with $400,000 in contributions to the San Gabriel Mosque.  That

3   wasn't defendant's money.  The Government has provided the

4   Court with evidence that the defendant submitted two invoices,

5   one for $50,000, one for $350,000, to Person J for those

6   contributions to the San Gabriel Mosque.  Those invoices were

7   paid.  And then rather than contributing the entirety of the

8   $400,000 to the San Gabriel Mosque, the defendant actually

9   pocketed a portion of it, skimmed a portion of it.

10              And based upon the defendant's filings in his

11  final sentencing brief, well, it appears that, depending upon

12  the time frame -- if you consider donations that were made

13  after the invoices as well as ones that were made before the

14  invoices, he still didn't come up with $400,000 in donations

15  but about 390,000.  And he includes in his calculations

16  something about contributions to Biking For Books that has

17  nothing to do with the San Gabriel Mosque.

18              So my point is there are many reasons to reject

19  acceptance of responsibility in this case, and the other

20  Mr. O'Brien seems to be focused on one.

21              THE COURT:  Well, let me make something clear.

22  There is a count -- the single-count Information charging

23  obstruction of justice and witness tampering.  But some of the

24  discussion and some of what I placed on the record about the

25  obstruction of justice pre-guilty plea has to do with the

1    upward adjustment.  So there are two different things.

2              MR. DANIEL O'BRIEN:  I actually wanted to speak

3    to that because the other Mr. O'Brien is arguing that it is

4    unfair what SDNY did to file charges when the Government agreed

5    not to charge it.  But the reason the Government agreed not to

6    charge the obstruction is because the parties -- first of all,

7    Mr. Zuberi wasn't willing to admit it in the plea and because

8    the parties agreed to litigate it at sentencing.  It makes no

9    difference whether it is charged or litigated at sentencing

10   because it makes no difference to the sentence imposed.

11             If SDNY had not filed any charge at all, it would

12   make no difference to the sentencing today because the

13   defendant would still have received a two-level enhancement for

14   obstruction of justice based upon the series of obstructions

15   argued by the Central District of California U.S. Attorney's

16   Office.  So I understand why --

17             THE COURT:  All right.  There is no -- the

18   guideline range does not reflect the single-count Information

19   in the SDNY case because that conduct is captured in the

20   two-level upward adjustment that was applied.

21             MR. DANIEL O'BRIEN:  Correct.

22             THE COURT:  So when I was going through the

23   guideline calculation, I don't even mention the SDNY case

24   because it's not even grouped.

25             MR. DANIEL O'BRIEN:  Right.  It has no impact.

1                    THE COURT:  Exactly.

2                    MR. DANIEL O'BRIEN:  And as -- I appreciate the

3    Court making a finding with regard to -- a factual finding with

4    regard to exactly what that money was that was being paid back.

5    It wasn't -- it was the repayment of the investment, and I

6    appreciate the time and detail that the Court went into making

7    its factual findings.

8                    Mr. Davis talked about how Mr. Zuberi is

9    underwater.  I don't understand his math.  The Court didn't

10   impose the fine recommended by the Government.  It imposed a

11   much lesser fine of $1,750,000.  He clearly has the ability to

12   pay that fine.

13                   Mr. Davis also made the point with respect to the

14   FBAR, that it is not Mr. Zuberi's signature on the FBAR.

15                   THE COURT:  On that one.

16                   MR. DANIEL O'BRIEN:  Correct.  Well, on any of

17   the FBARs that were filed.  But I addressed that point in my

18   response to the defendant's initial sentencing factor analysis.

19   In fact, I can pull it up, the page, for the Court, but I can

20   recite it pretty much from memory.  And that is it doesn't

21   matter whether the signatures are on it or not.  The

22   correspondence shows that he was aware of it.  It shows that he

23   was out of town and so he had to have an electronic signature

24   sent.

25                   Moreover, there are a lot of bases for the Court

1    to impose the sophisticated means enhancement, and I didn't

2    take the Court's recitation of certain factors as being all

3    encompassing.  I think there are many factors that's in the

4    Government's briefing that was not specifically articulated by

5    the Court in finding that sophisticated means applied in this

6    case.  In fact, I know that the Court quite often said you were

7    highlighting certain things or that -- and for other reasons.

8            And, in particular, I want to point out that,

9    with regard to the sophisticated means, the defendant actually

10   directed Person P not to file a tax return with respect to one

11   of these shell companies or whatever that was created.  That

12   shows a degree of sophistication and planning that exceeds the

13   normal case.  So I would rely on things that I have already

14   stated in my brief.  I don't need to repeat them here.  There

15   are multiple reasons to impose the sophisticated means

16   enhancement.

17           There were some points I wanted to make with

18   respect to the final brief the defense has filed.  I don't

19   really see the value in doing it right now with the exception

20   of I do want to point out that, when we talk about all the

21   humanitarian and charitable work that the defendant has claimed

22   credit for, the Government agrees that much of it is impressive

23   and it should be a factor.  It agrees with the Court it should

24   be a factor in fashioning an appropriate sentence.  But it has

25   to be counterbalanced obviously with the aggravating factors,

1   and I'm not going to recite them here.

2              One thing in particular that stands out, the

3   defense is still claiming that the defendant tried to stop a

4   Middle East war with respect to his involvement in Qatar, and

5   the evidence that the Government has submitted to the Court

6   flatly refutes that.  The Court knows from the Government's

7   filings that this was a moneymaking enterprise, that in

8   June 2017 he secretly lobbied on behalf of Qatar in violation

9   of FARA, that he actually excitedly exclaimed, "If we pull this

10  off, we will own half of Qatar."  And he received $4 million

11  that same month from Qatar.

12             So this wasn't a patriotic endeavor.  It was

13  something that was another part of the scheme for which the

14  defendant had been charged.

15             I think I have addressed the major points.

16  Unless the Court has any questions, I would submit.

17             THE COURT:  Thank you.  Someone has their phone

18  on.

19             MR. DANIEL O'BRIEN:  It might be me, Your Honor.

20  I apologize.

21             THE COURT:  Please turn it off.  I should have

22  said this at the outset, and just remind there is no recording

23  allowed in the courtroom.

24             Mr. Zuberi, I understand that you wish to address

25  the Court as is your right.  So if you would stand at the

1  lectern, please.

2              THE DEFENDANT:  Thank you, Your Honor, for giving

3  me the opportunity to say a few words.

4              Knowing that I would be nervous standing before

5  you, I wrote a lengthy story of my life.  I hope you found

6  those sentiments to be helpful in getting to know me a little

7  bit more.

8              Please know that I am remorseful for my failure

9  in this case.  Obviously I have nobody else to blame but myself

10 for my conduct.  My family, my friends, and relatives trusted

11 me to use good judgment.  I didn't.  I'm here today.  That

12 proves that I have failed.

13             Your Honor, I wish I could undo the past, but I

14 can't.  But I am deeply sorry, and of course, I am humiliated

15 as I stand in front of you.  I am grateful for this country for

16 second chance for those who earn it.  I'm determined to prove

17 worthy of the second chance.  Knowing that my conviction would

18 hurt my family and kids, especially my kids who are -- who have

19 done nothing wrong, I have spent considerable time finding ways

20 to be value to people.  Some of them are in the audience.

21             I have helped work on training people who are

22 incarcerated, writing a book and training them on how to start

23 a business when they get out of prison.  We have also started

24 two websites, one for prisoners who are getting out of jails

25 and other for veterans who are getting out of -- who are

1    getting discharged.  Those are just two of the ways.  There are

2    many others.  It would just take too much time.  To amend my

3    conduct for what I have done, I remain committed to using my

4    story to make sure nobody else makes mistakes that I do.  At

5    least they learn from me.

6              To close, I have no excuse for what I have done.

7    I accept full responsibility, and I will make sure -- I will

8    make sure that I am not in front of a court again.

9              Thank you.

10             THE COURT:  Thank you.

11             Do you wish to respond to any of the arguments

12   made by the Government?

13             MR. TOM O'BRIEN:  No, Your Honor.  We will

14   submit.  Thank you.  We have nothing further.

15             THE COURT:  Is there any legal cause why judgment

16   should not now be imposed?

17             MR. TOM O'BRIEN:  No, Your Honor.

18             MR. DANIEL O'BRIEN:  No, Your Honor.

19             THE COURT:  All right.  Mr. Zuberi, would you

20   stand at the lectern, please, with your counsel.

21             The Court has considered the sentencing factors

22   set out at 18 United States Code Section 3553(a) as well as the

23   advisory sentencing guidelines and hereby imposes the sentence

24   as follows:

25                  It is ordered that the defendant shall pay to the

1  United States a special assessment of $400 due immediately.

2  Any unpaid balance shall be due during the period of

3  imprisonment at the rate of not less than $25 per quarter and

4  pursuant to the BOP's Inmate Financial Responsibility Program.

5           It is ordered that the defendant shall pay

6  restitution in the total amount of $15,705,080.11 pursuant to

7  18 United States Code Section 3663(a)(3).  Of course, to the

8  extent that defendant has already made payments towards that

9  obligation, those must be credited.

10          The amount of restitution ordered should be paid

11  to the Internal Revenue Service.

12          Restitution shall be paid in full immediately.

13  The Court finds from a consideration of the record that the

14  defendant's economic circumstances allow for a full and

15  immediate payment of restitution.

16          It is ordered that the defendant shall pay to the

17  United States a total fine of $1,750,000 consisting of the

18  following: In Count 1 of the Information in case

19  No. 19 CR 642-1 -- that is the CACD case -- a fine of

20  $1 million; on Count 2 of the Information in that case, a fine

21  of $500,000; and Count 3 of the Information in that case, a

22  fine of $250,000.  The total fine shall bear interest as

23  provided by law if not paid immediately.

24          Pursuant to the Sentencing Reform Act of 1984, it

25  is the judgment of the Court that the defendant

1    Imaad Shah Zuberi is hereby committed on Counts 1 through 3 of

2    the Indictment in case No. 19 CR 642 in Count 1 of the

3    Information in case No. 20 CR 155 to the custody of the Bureau

4    of Prisons for a term of 144 months.  This term consists of

5    60 months on each of Counts 1, 2, and 3 of the Information in

6    case No. 19-642 and 84 months on count -- those are to run

7    concurrently.  And then consecutively on Count 1 of the

8    Information in case No. 20-155 to be served consecutively to

9    the counts in case No. 19-642.

10            Upon release from imprisonment, the defendant

11   shall be placed on supervised release for a term of three years

12   consisting of three years on each of Counts 1 through 3 of the

13   information in case No. 19-642 in Count 1 of the Information

14   and in case No. 20-155.  All such terms to run concurrently and

15   under the following terms and conditions:

16            He shall comply with the rules and regulations of

17   the U.S. Probation and Pretrial Services Office and General

18   Order 20-04 including condition 14, the second amended version

19   of condition 14 in that general order.

20            During the period of community supervision, he

21   shall pay the special assessment, the fine, and the restitution

22   in accordance with this judgment's orders regarding such

23   payment.

24            He shall truthfully and timely file and pay taxes

25   owed for the years of conviction and shall truthfully and

1    timely file and pay taxes during the period of community

2    supervision.

3              Further, the defendant shall show proof to the

4    probation officer of compliance with this order.

5              He shall cooperate in the collection of a DNA

6    sample from the defendant.

7              He shall apply all monies received from income

8    tax refunds, lottery winnings, inheritance, judgments, and any

9    other financial gains to the court-ordered financial

10   obligations.  That is the fine and the restitution order.

11             The defendant shall submit his person, property,

12   house, residence, vehicle, papers, computers, cell phones,

13   other electronic communications or data storage devices or

14   media, e-mail accounts, social media accounts, cloud storage

15   accounts, or other areas under his control to a search

16   conducted by United States Probation Officer or law enforcement

17   officer.  Failure to submit to a search may be grounds for

18   revocation.

19             The defendant shall warn any other occupants that

20   the premises may be subject to searches pursuant to this

21   condition.  Any search pursuant to this condition will be

22   conducted at a reasonable time and in a reasonable manner upon

23   reasonable suspicion that the defendant has violated a

24   condition of his supervision and that the areas to be searched

25   contain evidence of this violation.

1          The defendant shall truthfully and timely file

2   and pay taxes owed for the years of conviction and shall

3   truthfully and timely file and pay taxes during the period of

4   community supervision, and the defendant shall show proof to

5   the probation officer of compliance with this condition.

6          The Court suspends the drug testing condition

7   otherwise mandated by statute based upon the Court's

8   determination that this defendant poses a low risk of future

9   substance abuse.

10          All right.  Have the parties discussed a

11   self-surrender date?

12          MR. DANIEL O'BRIEN:  No, Your Honor.

13          MR. DAVIS:  Your Honor, if I may clarify one part

14   of the Court's judgment as it relates to the filing of tax

15   returns from the years of conviction.  I believe -- Your Honor,

16   there are two ways of fixing tax problems.  One is with a

17   closing agreement which has been done in this case.  Another is

18   filing amended returns.

19          THE COURT:  All right.

20          MR. DAVIS:  I just want to make sure he is not

21   expected to do that.

22          THE COURT:  Because of the closing agreements?

23          MR. DAVIS:  Correct, Your Honor.

24          THE COURT:  Any objection?

25          MR. DANIEL O'BRIEN:  No objection, Your Honor.

```
 1                    THE COURT:  Thank you.  That will be corrected.
 2                    MR. TOM O'BRIEN:  May I have one moment,
 3  Your Honor?
 4                    THE COURT:  Certainly.
 5                    MR. DANIEL O'BRIEN:  May I have just a moment?
 6                    (Counsel confer.)
 7                    MR. TOM O'BRIEN:  Your Honor, after discussions
 8  with Dan O'Brien, I believe the parties would agree in terms of
 9  increasing bail -- I want to point out that we have
10  Mr. Zuberi's passport.  We had it since he stopped traveling.
11                    THE COURT:  Well, let me interrupt for a moment.
12  I'm not concerned about an increase in the bail amount.  He's
13  not wearing an ankle bracelet.
14                    MR. TOM O'BRIEN:  Not now.
15                    THE COURT:  That's the condition that I think is
16  appropriate.
17                    MR. TOM O'BRIEN:  We're fine with that.
18                    MR. DANIEL O'BRIEN:  Well, Your Honor, the
19  Government was requesting an ankle bracelet plus telephonic
20  voice location verification monitored by the probation
21  department.  The Government also feels that an additional bond
22  that the defendant was willing to post in the form of quitclaim
23  deed to the property would greatly assist the Government in
24  trying to secure Mr. Zuberi's surrender.
25                    And the reason I was thinking of the $6 million
```

1  figure is because, by Mr. Davis's calculations, there's still

2  $4 million to be paid in back taxes, plus the Court has imposed

3  a fine of nearly $2 million.  So that gets us up to $6 million.

4          I think that -- ankle bracelets are not full

5  proof.  I have personally experienced situations in my career

6  where an ankle bracelet was defeated, and in a case like this

7  where defendant was born in Pakistan, has family in Pakistan,

8  has property in Pakistan, has represented that I believe he has

9  millions of dollars in Pakistan, in a case where the defendant

10  has literally spent in -- during the offense conduct almost

11  half his time traveling overseas, I feel that the posting of an

12  additional bond is needed in addition to the monitoring by the

13  probation department.

14          THE COURT:  Mr. O'Brien?

15          MR. TOM O'BRIEN:  Well, Your Honor, we have my

16  client's passport which we can turn into the Court if the Court

17  wants.  The Government I believe has had my client's wife's

18  passport for a long time as well.  They are all U.S. citizens.

19  They are here.  We are going back and forth on some dispute on

20  some of these properties, how they are encumbered, et cetera.

21          I guess my feeling is, Your Honor, he's not a

22  flight risk.  He's a U.S. citizen.  He's known about the

23  investigation for years.  Nothing has changed.  This is not

24  like a jury trial where we proclaim innocence and suddenly he

25  is convicted and a massive change of circumstances.  I think we

1    have seen the Government's recommendation for a fairly long

2    time and the Court has imposed it.

3              He is being -- he's going several more years -- I

4    calculate the top of my head -- in federal prison because he

5    made 13 of the 16-and-a-half-million dollars.  The Government

6    has liens on the remainder of the properties to get their

7    fees -- their taxes back.  I think that is enough.

8              THE COURT:  Well, let me ask you this.  Are there

9    liens on all the remaining unsold properties?

10             MR. DANIEL O'BRIEN:  No.

11             THE COURT:  Just a certain number of them;

12   correct?

13             MR. TOM O'BRIEN:  Let me have Mr. Davis, if you

14   don't mind, Your Honor.

15             THE COURT:  Of course.

16             MR. DAVIS:  So, Your Honor, by operation of law,

17   as soon as a tax assessment is made, which has been done in

18   this case, a federal tax lien arises on all properties and

19   rights to properties of the defendant.  So the lien exists on

20   all of his properties.  The IRS separately, because these

21   properties, other than I think his residence, are held in

22   LLC's.  So he owns or his wife owns the LLC which makes it more

23   difficult for the IRS to collect on the property.

24             We -- as noted earlier, we gave quitclaim deeds

25   as to the properties that basically would allow the Government

```
 1   to move it out of an LLC and directly into his name subject to
 2   therefor directly the federal tax lien.
 3                  Additionally, the IRS has imposed what are known
 4   as nominee liens on most of the properties.  There may be one
 5   excepted, but I believe there are four nominee liens on the
 6   remaining properties which, from the IRS's perspective, go
 7   directly to the properties because basically they're
 8   disregarding the LLC's.  So the Government is protected in that
 9   fashion already.
10                  THE COURT:  When you say a lien arises, you are
11   talking about some of the common law interest.
12                  MR. DAVIS:  By statute it is a lien.  The IRS
13   then files something called a Notice of Federal Tax Lien which
14   I believe has also been filed.
15                  THE COURT:  Okay.  That was my -- that is what I
16   am referring to.
17                  MR. DAVIS:  That relates to basically giving
18   notice to subsequent purchasers as to the facts of the lien.
19                  THE COURT:  So has that notice of tax lien been
20   filed on all the properties?  I don't believe it has.
21                  MR. DAVIS:  So the notice of tax lien is filed,
22   as I said, for all property and rights to property.  It is
23   filed in the county.  My recollection is one has been filed
24   here although off the top of my head I can't say for sure.  The
25   IRS agents are here, and my accountant is here.  I believe a
```

```
 1    notice of tax lien has been filed for all $16 million.

 2                THE COURT:  For $16 million.

 3                MR. DAVIS:  Yes.

 4                THE COURT:  That's my question.  All right.

 5                MR. DANIEL O'BRIEN:  Your Honor, but the problem

 6    here is the LLC's.  And it is one thing to file liens against

 7    the individual.  It's another thing to file liens against the

 8    nominee which is the LLC.  And my understanding is that no

 9    nominee liens have been filed with respect to those properties

10    by Mr. Davis's request.

11                MR. DAVIS:  That is incorrect, Your Honor.

12                MR. DANIEL O'BRIEN:  And -- the other point I

13    want to make is I believe that the quitclaim deed pertains to

14    properties that have since been sold and liquidated.  So I

15    don't think that there is any quitclaim deeds of properties

16    that --

17                THE COURT:  You're saying the Government isn't

18    holding any quitclaim deeds to properties other than those

19    which have been liquidated.

20                MR. DANIEL O'BRIEN:  That is my understanding.

21    Maybe I can confer with Mr. Davis and we can get our facts

22    straight.

23                THE COURT:  Why don't you confer for a few

24    moments.

25                     (Counsel confer.)
```

1          MR. DANIEL O'BRIEN:  What the Government has

2    proposed is this.  The Government proposes that the defendant

3    be given the surrender date of approximately 90 days in the

4    future, and within some period of time set by the Court -- I

5    don't know how many weeks it might take to happen, perhaps two

6    weeks -- is that reasonable?

7          MR. DAVIS:  Certainly to execute them.  We are

8    talking about filing quitclaim deeds to make sure that there's

9    $6 million worth of property over which there are quitclaim

10   deeds.  So if the Government wants to execute in some fashion,

11   they would be able to do that without having to go through the

12   LLC's.

13         MR. DANIEL O'BRIEN:  Correct.

14         MR. DAVIS:  The literal recording of that I don't

15   want to promise because we are in a pandemic and a lot of these

16   offices are closed, but we can at least deliver them to the

17   Government, and they can do what they want with them.

18         MR. DANIEL O'BRIEN:  So the quitclaim deeds

19   totaling $6 million plus the ankle bracelet and the voice

20   recognition monitoring.

21         THE COURT:  All right.  So, first of all, I'm

22   going to make the order with respect to it's no longer pretrial

23   conditions of release but the defendant's release until the

24   date of self-surrender that he report to the United States

25   Probation Office by the close of business today located at

1   300 North Los Angeles Street for instructions as to the

2   electronic monitoring ankle bracelet and a voice recognition

3   software.

4           And then this may be too early.  You may not have

5   an answer for this.  The self-surrender date in 90 days, does

6   the defense at this time anticipate making a motion for bail

7   pending appeal?

8           MR. TOM O'BRIEN:  I don't have an answer yet,

9   Your Honor.  We have to discuss this with the client obviously.

10  The 90-day surrender date is certainly fine.  The only issue I

11  raised with Mr. Dan O'Brien is, because, of course, of COVID --

12  and the client has submitted documentation regarding his

13  medical condition that I think would put him in a higher risk

14  than many depending on how the COVID progresses -- if we can

15  petition the Court for an extension potentially after that if

16  necessary.

17          THE COURT:  That is always an option.

18          MR. TOM O'BRIEN:  All right.

19          THE COURT:  All right.  So 90 days would put us

20  in May.

21          If your client could join you.

22          MR. TOM O'BRIEN:  Please.

23          THE COURT:  So, Mr. Zuberi, you are ordered that

24  you shall surrender yourself to the institution designated by

25  the Bureau of Prisons on or before 12:00 o'clock noon on

1    Tuesday, May 25th, 2021.  If the institution hasn't been

2    designated, then you are to report on or before that same day,

3    Tuesday, May 25th, 2021, to the United States Marshal located

4    at the Roybal Federal Building, 255 East Temple Street,

5    Los Angeles, California.

6              So unless you are told otherwise, you are to

7    report to the facility that's been designated.

8              Is there a request for placement in

9    Southern California?

10             MR. TOM O'BRIEN:  Yes, Your Honor.  Thank you.

11             THE COURT:  All right.  That will be the

12   recommendation of the Court to the Bureau of Prisons.

13             There are no counts to be dismissed.

14             The bond will not -- will be exonerated upon the

15   self-surrender.

16             Mr. Zuberi, by pleading guilty and by the terms

17   of the plea agreements that you signed in these cases, you have

18   given up most of your rights to appeal your convictions and

19   your sentence.  I'm still required to inform you about the

20   appeal process.

21             So a defendant may appeal by filing a Notice of

22   Appeal with the clerk of court.  He may ask that he be allowed

23   to file any such Notice of Appeal without paying the fee that

24   is usually required.  You have 14 days or two weeks from

25   today's date to file your Notice of Appeal or you lose your

1   right to appeal.

2                   Do you understand?

3                   THE DEFENDANT:  Yes.

4                   THE COURT:  Anything further from either side?

5                   MR. TOM O'BRIEN:  No, thank you, Your Honor.

6                   MR. DANIEL O'BRIEN:  Your Honor, can we get a

7   concrete date for the defense to provide the quitclaim deeds?

8                   THE COURT:  Thank you.  So the quitclaim deeds to

9   the properties that have been discussed, let's make that

10  Friday, March 5th.  That's two weeks from tomorrow.  Friday,

11  March 5th by 4:00 o'clock p.m.

12                  MR. DANIEL O'BRIEN:  Thank you, Your Honor.

13                  THE COURT:  All right.

14                  (Proceedings concluded at 1:29 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6  COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7  THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8  PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9  FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15                    DATED THIS  5TH  DAY OF MARCH, 2021.

16

17

18                    /S/ MIRANDA ALGORRI

19                    _____
                      MIRANDA ALGORRI, CSR NO. 12743, CRR
20                    FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25