David A. Warrington
*David.warrington@kutakrock.com*
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219
Telephone:  (202) 828-2438
Facsimile:  (202) 828-2400

*Attorney for Defendant Imaad Shah Zuberi*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IMAAD SHAH ZUBERI,<br><br>Defendant. | Case No.: 2:19-cr-00642-VAP<br>No.: 2:20-cr-00155-VAP<br><br>**OPPOSITION TO GOVERNMENT'S APPLICATION FOR AN ORDER MODIFYING MR. ZUBERI'S CONDITIONS FOR RELEASE**<br><br>[*Declaration of David A. Warrington, Declaration of Ashwin J. Ram, and Declaration of Angel E. Reyes concurrently filed herewith*]<br><br>The Honorable Virginia A. Phillips<br><br>No Hearing Date Requested |

## I. INTRODUCTION

The government's request to impose additional restrictions on Mr. Zuberi's release was driven by one changed circumstance—Mr. Zuberi allegedly having $7.5 million in cash after selling two of his properties to raise enough money to satisfy his fine and restitution. In light of the government's claim of Mr. Zuberi's new liquidity, this Court ordered the parties to brief whether an additional bond should be required.

In truth, Mr. Zuberi has no more than 10% of that amount—$750,000[1]— in his domestic accounts, after accounting for the pending payments he has made to the government. Those payments include the $1 million in remaining interest, satisfying his obligations to the government in full (and removing any justification for a new $1 million bond to cover the now-paid interest).[2] The government's expressed concern that Mr. Zuberi has new millions available to him is misplaced. And any concern that Mr. Zuberi might be able to transfer any remaining cash has already been addressed by the Court's order barring any overseas funds transfers.

Realizing its error, the government falls back on a potpourri of attempted justifications for nonetheless increasing Mr. Zuberi's bond and restrictions. First, it rehashes the same allegations it raised in opposing Mr. Zuberi's motion to extend his report date, regarding Mr. Zuberi's February trip to Orange County, his curfew violations, the delivery of his required quitclaim deeds, and his failure to be vaccinated yet. This Court has already decided the motion regarding Mr. Zuberi's report date. And although the Court took seriously the issue of curfew

---

[1] There also appears to be several pending checks that will substantially diminish this amount.

[2] Mr. Zuberi made this interest payment despite the fact that amount owed is currently disputed. Indeed, earlier in the week AUSA O'Brien indicated that the interest owed to the IRS was approximately $500,000. Trans. at 13. Then, later in the same week, IRS Revenue Agent Farrell Stevens indicated the interest owed is approximately $1,000,000. AUSA O'Brien Declaration at ¶ 12.

compliance, it did not welcome relitigation of the details of Mr. Zuberi's bond compliance. Those details do not warrant a new round of restrictions.

Next, the government points to Mr. Zuberi's ownership of property both outside and inside the United States. But the government knew about all of these assets when it agreed to Mr. Zuberi's revised bond conditions at sentencing, and when it proposed modification of them immediately after sentencing. There are no changed circumstances that support yet another modification to Mr. Zuberi's conditions.

The government then resorts to an outrageous suggestion: that Mr. Zuberi and his co-counsel on this case, a former AUSA in this district, are engaged in improper conduct that would be facilitated by another client of co-counsel. This insinuation is utterly without support, and deeply offensive. But the federal prosecutor's pointed interest in an unrelated state-court matter handled by his counsel, and the federal prosecutor's gratuitous false statement to state prosecutors that Mr. Zuberi does not possess a single dollar not earned feloniously, continues to suggest an unexplained animus toward Mr. Zuberi. Such animus and unfounded smears do not warrant new changes to Mr. Zuberi's bond conditions.

Finally, the government admits (twice) that its reason for noticing a hearing is so that it can continue to "issue subpoenas to further its investigation [into] defendant's assets and financial transactions." There is no basis for these continuing subpoenas. The government's investigation and prosecution are complete. Mr. Zuberi's financial obligations to the government are paid, potentially beyond what he actually owed. His financial condition is known to the Court and the Probation Department, and his conditions of release have been established and complied with. The principal effect of the government's ongoing subpoena campaign is to cause banks to close Mr. Zuberi's accounts and cease banking with him. The government's admitted interest in continuing to issue such subpoenas,

and its request to calendar a hearing solely to allow it to do so, amounts to fishing at best and harassment at worst.

No new liquid cash, and no changed circumstances, support any further modifications to Mr. Zuberi's release conditions. This Court should deny the government's application.

## II. DISCUSSION

### A. Mr. Zuberi does not have an excess of cash that requires additional bond be posted to ensure his reporting

On May 3, 2021, this Court granted, in part, Mr. Zuberi's motion to extend his surrender date. His surrender date was moved from May 25, 2021 to June 18, 2021 so Mr. Zuberi could become fully vaccinated against the COVID-19 virus before reporting.[3] Mr. Zuberi has consulted with his doctors and is scheduled to receive the first dose of a COVID vaccine on May 8, 2021.[4]

During the hearing regarding the motion, the government claimed that Mr. Zuberi now has $7.5 million in cash after selling two properties, and voiced concern that nothing is preventing Mr. Zuberi from "wiring that cash out of the country and then deciding to flee."[5] To address that concern, the Court ordered that there be no overseas transfers of funds, effective immediately.[6] Mr. Zuberi takes no issue with such modification.

After obtaining more information, the government has revised its liquidity estimate in its application for bond modification. The government now claims – without acknowledging its earlier misinformation – that the two property sales referenced during the hearing "have generated approximately $1.7 million [*not*

---

[3] *Id*. *See also* Trans. at 45.
[4] Declaration of David Warrington at ¶ 5; Exhibit B.
[5] Trans. at 13.
[6] *Id*. at 89.

3

*$7.5 million*] in cash that could be transferred out of the country should defendant attempt to flee." (App. at 3).  The government also points out that Mr. Zuberi has paid his restitution and fine, but asserts he still owes approximately $1 million in interest.  Because of the alleged flight risk caused by Mr. Zuberi having $1.7 million in cash and the interest owed to the IRS, the government asks the Court to increase Mr. Zuberi's bond by "at least an additional $1 million." (App. at 4).

Such an increase is unwarranted because Mr. Zuberi has now paid all interest potentially owed to the IRS.  Moreover, even if Mr. Zuberi did have an excess of liquidity, the government's argument that he is flight risk was sufficiently addressed when the Court ordered that Mr. Zuberi cannot transfer any money outside of the country.

### 1. Mr. Zuberi has paid his interest to the IRS

Since Mr. Zuberi paid the remaining principal on his restitution, fine, and special assessment on April 27, 2021,[7] he and his counsel have been trying to ascertain whether, and how much, interest had accrued on the fine, special assessment, and/ or restitution.[8]  After the government's filing identified IRS Revenue Agent Farrell Stevens as the individual who could calculate Mr. Zuberi's interest, Mr. Zuberi's tax counsel, Rob Wood, reached out to Agent Stevens over the telephone to confirm the interest owed.[9]  Agent Stevens informed Counsel Wood that if Mr. Zuberi's check is received by May 11, 2021, the total interest would be $1,017,014.[10]  If he received the check after May 11, 2021, the interest will add $83.59 each day.[11]

The same day Mr. Zuberi received this confirmation, he sent a check for

---

[7] Doc. 365-10.
[8] *See* Declaration of Angel E. Reyes at ¶¶ 2-4.
[9] *Id*. at ¶5.
[10] *Id*.
[11] *Id*.

$1,018,000 to Agent Stevens to satisfy the remaining interest.[12]  This covers the interest through May 22, 2021 in the event the check arrives late to the IRS.  After this payment clears, Mr. Zuberi will have approximately $750,000 in his domestic accounts.[13]  This amount will be substantially reduced after other pending checks are processed.

### 2. Mr. Zuberi's remaining liquidity and assets are not a changed circumstance justifying additional modifications to Mr. Zuberi's conditions of release

Mr. Zuberi's remaining liquidity amounting to $750,000 (not accounting for additional checks that are currently pending) is not a changed circumstance.  As of February 1, 2021, Mr. Zuberi had approximately $560,000 in liquidity in these same accounts.[14]  Throughout this period, he regularly had millions more in liquidity as he was currently selling his properties to raise money for the fine and restitution.

At sentencing, the government proposed that the Court allow Mr. Zuberi to self-surrender, with the added conditions of an ankle bracelet and the posting of additional bond in the form of certain quitclaim deeds.[15]  By making this proposal, the government necessarily (if tacitly) conceded that on those conditions, Mr. Zuberi poses no flight risk. This Court agreed and allowed Mr. Zuberi to remain on release pending his self-surrender date.  There are no existing over-liquidity concerns, but even if there were, this Court's modification to prevent Mr. Zuberi from transferring funds oversees is sufficient to address the government's concern.

The government also points to Mr. Zuberi owning other property in the

---

[12] *Id*. at ¶ 6; Exhibit A.
[13] Declaration of D. Warrington at ¶ 2.
[14] *Id*. at ¶ 4.
[15] Sent. Tr. 58, 63.

1 | United States worth approximately $5.66 million.  The government cannot explain
2 | how this is a changed circumstance.  In fact, the Initial Presentencing Report filed
3 | in January of 2020 listed Mr. Zuberi's real estate assets at $32,053,000.[16]  The
4 | government, the Court, and the Probation Department had this information when
5 | Mr. Zuberi's conditions of release were modified on February 5, 2020[17] and again
6 | on February 19, 2021.[18]  The real estate known to the government since January of
7 | 2020 is not a changed circumstance warranting modification of Mr. Zuberi's bond
8 | seventeen months later.

The same is true of Mr. Zuberi's overseas property.  The government has known about those assets for years.  Prior to sentencing, the government even allowed Mr. Zuberi to travel internationally to sell some of those properties to satisfy his restitution.[19]  The same is also true for any funds Mr. Zuberi has available overseas.  The government admits it had this information since at least October of 2020 when it received FBARs identifying the maximum balances for the calendar year 2019. (App. at 7).

Even though the government cannot show any changed circumstances justifying another modification of Mr. Zuberi's bond, the government still requests this Court to hold a hearing.  (App. at 7.)  No hearing is necessary.  The government readily admits (twice) that it only seeks the hearing so it "may issue subpoenas to gather more current data with respect to defendant's assets."[20]  The government has no legitimate basis to issue more subpoenas concerning Mr. Zuberi's account balances.  Now that Mr. Zuberi has paid all of his obligations to the government (including a potential overpayment), the government's subpoenas

---

[16] Doc. 58 at 29.
[17] Doc. 75.
[18] Doc. 329.
[19] See Doc. 73.
[20] Dkt. 365 at 5:4-7, 7:18-21.

will accomplish only one thing—closing more of Mr. Zuberi's bank accounts.

To date, Mr. Zuberi has had more than thirty bank accounts closed and nine credit cards cancelled as the result of subpoenas from the government. Each time one of these accounts closes, Mr. Zuberi has to move his funds to another account. Indeed, these closures caused delay in Mr. Zuberi paying his fine and restitution which, in turn, resulted in a higher interest payment that Mr. Zuberi paid. Further, these closures, and the resulting transfers, open up Mr. Zuberi to reckless and unfounded money laundering accusations.

The government appears to be misusing its subpoena power by issuing subpoenas for hearings entirely unrelated to Mr. Zuberi's bond conditions. This tactic appears to be for the sole purpose of causing Mr. Zuberi additional pain. The government's subpoenas must end. Mr. Zuberi has paid his fine, restitution, special assessment, with interest—totaling almost $20 million.

### B. There is no adequate basis for further restricting Mr. Zuberi's curfew or travel to Orange County

The government seeks additional restrictions on Mr. Zuberi's curfew. Mr. Zuberi is currently limited to his home during the hours of 5:00 p.m. to 9:00 a.m. each day. He is only allowed to travel within Orange County and Los Angeles County. The government seeks to "extend his curfew" to cover weekends (such that he cannot leave his house over the weekend) and restrict his travel to Orange County only for the purposes of visiting his mother's gravesite. (App. at 4).

#### 1. There is no justification for expanding Mr. Zuberi's curfew to the weekends

To support expanding Mr. Zuberi's curfew, the government points to issues already litigated before this Court during Mr. Zuberi's motion to extend his report date. The government revives its claim that Mr. Zuberi's two curfew violations

7

after meeting with his defense team[21] shows an inclination to flee. (App. at 4-5). During the May 3, 2021 hearing, the Court rejected this argument, noting that these violations do not "indicate intent to flee."[22]  Nor do these violations, though regrettable, justify further restricting Mr. Zuberi's curfew.

The government next points to the quitclaim issue that was also litigated in advance of the May 3 hearing.  Though counsel is reluctant to relitigate the issue here, it must respond to the government's claims.

The bond order required Mr. Zuberi and his spouse to execute quitclaim deeds "in favor of the government."[23]  Consistent with prior practice over the course of the case leading up to the sentencing, Mr. Zuberi and his former counsel interpreted that to mean that the deeds, which were then in the name of LLCs, needed to be quitclaimed to Mr. Zuberi so that the government's already-issued tax liens would attach to the properties.  Mr. Zuberi's prior counsel prepared those quitclaim deeds, Mr. Zuberi executed them, and his current counsel delivered them to the government on time.  The government took a different view, however, and interpreted "in favor of the government" to mean that the quitclaims had to be in the name of the IRS, despite the IRS's extant tax liens.  After his counsel conferred with the government, Mr. Zuberi signed the deeds in the name of the IRS and delivered them to his counsel.  Then, after an admitted delay in hearing back from the IRS with promised delivery instructions, counsel delivered them to the government.

Mr. Zuberi's two curfew violations and any delay in delivering revised quitclaim deeds based on ambiguity in the bond language does not justify eliminating Mr. Zuberi's ability to leave his home on the weekends until his report date.

---

[21] Doc. 359 at 10-11.
[22] Trans. at 7.
[23] Doc. 336 at 3.

Nor does the government's nebulous reference to government resources being strained by the "extended period of supervision" warrant extending Mr. Zuberi's already expansive curfew to the weekend. (App. at 8). Mr. Zuberi's reporting date was extended by roughly three-and-a-half weeks. This amounts to six weekend days. The government resources needed to monitor Mr. Zuberi for those six days—most of which are automated—is insufficient to justify a curfew modification.

Tellingly, neither one of the two U.S. Probation/Pretrial Services Officers assigned to Mr. Zuberi believe that his bond conditions require any affirmative modification.[24]

### 2. The government's argument that Mr. Zuberi's travel to Orange County should be restricted because he engaged in "recreational travel" is nonsensical

The government claims that Mr. Zuberi's "unnecessary travel" to the beach in Orange County "justifies a modification of the terms" of Mr. Zuberi's conditions of release. (App. at 5). Specifically, to modify the terms to allow "travel to Orange County only for the purpose of visiting his mother's gravesite"[25] and "only upon 24-hour advance notice to the U.S. Attorney's Office and the U.S. Probation Office." (App. at 4).

The government appears to misunderstand the facts of this visit to the beach. On the weekend in question, Mr. Zuberi visited his mother's gravesite with his children. When he was there, he met with his cousin (who lives in Orange County) and his children. Mr. Zuberi's two children wanted to go the beach with their cousins so they all drove the approximately five miles to Sunset Beach.

---

[24] Declaration of A. Ram ¶¶ 16-18.

[25] The government incorrectly list the gravesite of Mr. Zuberi's mother to be located in the Islamic Society of Orange County, Garden Grove, California. In reality, Mr. Zuberi's mother is buried at Westminster Memorial Park and Mortuary, 14801 Beach Blvd, Westminster, CA 92683.

1  This was all expressly allowed by the bond order.

2  The government's characterization of Mr. Zuberi's bond needing to be
3  changed because of his "recreational travel" is puzzling. By the government's
4  logic, Mr. Zuberi should be penalized if he takes his daughter to the Baskins Rob-
5  bins two miles from his home on a Tuesday afternoon. The government's pro-
6  posed modification is neither reasonable nor necessary.

7  **III.** **The government's suggestion that Mr. Zuberi is engaging in improper**
8  **conduct with the assistance of his counsel is baseless and offensive**

9  Finally, the government makes up out of whole cloth the shocking claim
10 that Mr. Zuberi's offer to assist with the bail of another client of co-counsel
11 ("client R.A.") "might actually" represent improper conduct. (App. at 8). This
12 utterly unfounded insinuation suggests that Mr. Zuberi, and his co-counsel here,
13 who served as an Assistant United States Attorney until January of last year and
14 has been granted an additional security clearance by the same government last
15 week,[26] are engaged in a scheme with client R.A. to engage in improper conduct.

16 To advance this smear, the government attaches a declaration from
17 Detective Lyle Barnes that summarizes the charges against client R.A., the
18 Superseding Indictment naming client R.A., and an email correspondence between
19 another attorney for client R.A. and state prosecutors that references Mr. Zuberi's
20 offer to help with client R.A.'s bail premium. The government's filing also
21 contains a declaration from AUSA O'Brien that says he spoke to Deputy Attorney
22 Generals Jessica Owen (DAG Owen) and Kristopher Young (DAG Young). They
23 informed AUSA O'Brien that co-counsel told them Mr. Zuberi "might gift [Client
24 R.A.] $100,000 for his bond." None of this information, *which was openly*
25 *disclosed and known to the identified state prosecutors*, who are prosecuting
26 client R.A., amounts to any improper activity on the part of Mr. Zuberi or his

---

28  [26] Trans. at 27.

10

counsel.

The actual facts are simple, less sensational, and importantly, have nothing to do with whether Mr. Zuberi's bond conditions should be modified. On the evening of April 29, 2021, Mr. Zuberi learned of client R.A.'s presumptive bail amount, sympathized, and immediately offered to commit up to $100,000 towards client R.A.'s bail.[27] Because client R.A. was not a flight risk, co-counsel understood that his bond would eventually be exonerated, and all bond commitments would be returned when any bond was exonerated.[28]

Mr. Zuberi agreed to commit this amount, even after learning that any bond payment would not be returned by the bail bondsman even after the bond was exonerated.[29] After some discussion with co-counsel and an associate at Steptoe & Johnson LLP, DAG Young objected to Mr. Zuberi being a source for the funds of client R.A.'s bail.[30]

On May 5, 2021, the court conducted a hearing to address the state's objections to client's R.A.'s bail package.[31] Mr. Zuberi testified during the hearing about the source of the funds he would provide for the bail package.[32] During this hearing, DAG Young made "various comments admitting that he had coordinated with certain Assistant United States Attorneys who had prosecuted Mr. Zuberi in preparation for the state court hearing."[33] Specifically, DAG Young began questioning Mr. Zuberi about his federal charges.[34] When the court

---

[27] Declaration of Ashwin Ram at ¶ 3.
[28] *Id.*
[29] *Id.* at ¶ 4.
[30] *Id.* at ¶¶ 7-9.
[31] *Id.* at ¶ 12.
[32] *Id.*
[33] *Id.* at ¶ 13.
[34] *Id.*

11
OPPOSITION TO GOVERNMENT'S APPLICATION TO MODIFY CONDITIONS OF RELEASE

interjected, DAG Young said that he had spoken to two Assistant United States Attorneys who had prosecuted Mr. Zuberi, and that the AUSAs had told DAG Young that Mr. Zuberi did not have a "single dollar" that was not "feloniously obtained." [35]

Co-counsel interjected and the court called a side bar to discuss the examination.[36] After the side bar, co-counsel moved to withdraw and strike Mr. Zuberi's testimony in its entirety.[37] The court granted the request with no objection from DAG Young.[38] As Mr. Zuberi was withdrawn as a witness, he did not contribute any funds to the bail bondsman who posted bail for client R.A. later that same day.[39]

The government's made-up representation that Mr. Zuberi's offer to contribute towards client R.A.'s bond (by providing funds to a bail bondsman, with the explicit understanding that there would be a Court hearing into all bail support), "might actually" represent unlawful activity is wildly improper, and fails to meet the basic responsibilities of an Assistant United States Attorney. It also raises serious questions regarding: the supervision of AUSA O'Brien; the historical and future impact of AUSA O'Brien's unveiled animus towards Mr. Zuberi; whether the Department of Justice should remove AUSA O'Brien from this prosecution; and AUSA O'Brien's knowledge about whether the patently false assertion that Mr. Zuberi had no legitimate assets would be conveyed to a court. What is pellucid is that this matter is utterly irrelevant to the question whether any further modifications to Mr. Zuberi's bond conditions should be entertained.

---

[35] *Id.*
[36] *Id.* at ¶ 14.
[37] *Id.*
[38] *Id.*
[39] *Id.* at ¶ 15.

12

## IV. CONCLUSION

For all of the foregoing reasons, this Court should deny the government's proposal modifications regarding Mr. Zuberi's curfew, travel restrictions, and bond amount.

Dated:  May 7, 2021

Respectfully submitted,

**KUTAK ROCK LLP**

By:   */s/ David A. Warrington*
      *David A. Warrington*
*Attorney for Defendant Imaad Shah Zuberi*